## FRAINA et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. December 11, 1918.)

No. 19.

1. CRIMINAL LAW ☞1090(19)—APPEAL—BILL OF EXCEPTIONS—TRANSCRIPT.
    Consent of both government and defendants to call transcript of stenographer's minutes by name of bill of exceptions was worthless, and Circuit Court of Appeals of grace only considers the points argued.

2. CRIMINAL LAW ☞1129(5)—APPEAL—ADDITIONAL ASSIGNMENTS.
    Additional and supplemental assignments of error, so called, filed without any leave of court, are worthless to present error in the Circuit Court of Appeals.

3. CRIMINAL LAW ☞1048, 1129(1)—APPEAL—ASSIGNMENTS RESTING ON NO EXCEPTIONS.
    Additional and supplemental assignments of error, so called, resting on no exceptions, are worthless to raise errors in the Circuit Court of Appeals, though the court may under the familiar rule notice a plain error not assigned.

4. CRIMINAL LAW ☞834(2)—INSTRUCTIONS—LANGUAGE OF REQUEST.
    When the law has once been fairly presented to the jury, neither party has a right to complain because the trial judge preferred his own language to that of counsel.

5. CONSPIRACY ☞43(6)—CONSPIRACY TO EVADE SELECTIVE SERVICE LAW.
    Count of indictment charging conspiracy by defendants, in that they agreed to commit offense against United States by aiding, abetting, counseling, etc., persons unknown unlawfully to evade and to aid others to evade the requirements of Selective Service Act, § 6 (Comp. St. 1918, § 2044f), held to state an offense under Criminal Code, §§ 37, 332 (Comp. St. §§ 10201, 10506).

6. CRIMINAL LAW ☞1153(3)—REVIEW.
    In prosecution for conspiring to evade and to aid other persons unknown to evade Selective Service Act, § 6 (Comp. St. 1918, § 2044f), act of trial judge in permitting proof of acts and declarations of conspirators before act of combining was made to appear, which was only a question of order of proof, held reviewable only when abuse of discretion injurious to defendants is shown.

7. CONSPIRACY ☞24—TO EVADE SELECTIVE SERVICE LAW—COMBINATION BY CONDUCTORS OF MEETING.
    Defendants, charged with conspiracy to evade and to help others in evading Selective Service Act, § 6 (Comp. St. 1918, § 2044f), who called mass meeting on matter by advertisement, and one of whom called meeting to order by announcing object of gathering as per advertisement, held to have combined or conspired in thought.

8. CRIMINAL LAW ☞1159(1)—REVIEW—PROVINCE OF JURY.
    Appellate courts, unless given power by statute, do not sit to correct possible errors of jury, but only those of court, and jury's supremacy as to facts, including inferences, is unquestioned; conviction being assailable only by demonstrating reasonable men could not as matter of law be convinced beyond reasonable doubt.

9. CONSPIRACY ☞43(12)—EVIDENCE—OVERT ACT.
    In prosecution for conspiracy to evade and to aid others in evading Selective Service Act, § 6 (Comp. St. 1918, § 2044f), prosecution can prove what might have been laid as overt act, but is not so charged, not being confined to overt acts charged, as there can be no legal complaint of testimony tending to show object of conspiracy, which evidence one may call overt act.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10. Constitutional Law ☞90—Right of Free Speech—Conspiracy to Evade Selective Service Law.**

Conviction of having conspired to evade and to aid others in evading Selective Service Act, § 6 (Comp. St. 1918, § 2044f), by having made certain speeches at a mass meeting and distributed a pamphlet there, *held* not an invasion of the constitutional right of free speech.

**11. Army and Navy ☞10—Interference with Draft—Conscientious Objection.**

If speeches at mass meeting of defendants charged with having conspired to evade or aid others in evading Selective Service Act, § 6 (Comp. St. 1918, § 2044f), furnished evidence of intent and effort to procure listeners to evade their military duties, such speeches would support conviction, though emphasizing defendants' conscientious objection to war and warfare on other than religious grounds.

In Error to the District Court of the United States for the Southern District of New York.

Louis C. Fraina and Edward Ralph Cheyney were convicted of conspiring to commit an offense against the United States by aiding and abetting, etc., unknown persons unlawfully to evade the requirements of the Selective Service Act, and they bring error.   Affirmed.

The indictment in two counts rests upon sections 37 and 332 of the Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1096, 1152 [Comp. St. §§ 10201, 10506]) and section 6 of the Selective Service Act of May 18, 1917, c. 15, 40 Stat. 80 (Comp. St. 1918, § 2044f).

Both counts charged a conspiracy on the part of the plaintiffs in error and others to the grand jurors unknown.   The object of the conspiracy described in the first count is stated as an agreement to commit an offense against the United States, viz. that they (plaintiffs in error and the persons unknown) "should fail and neglect fully to perform duties required of them in the execution of" the said Selective Service Act.

The second count similarly charges an agreement to commit an offense against the United States, viz. that they (plaintiffs in error and the persons unknown) "should aid, abet, counsel, command, induce and procure divers persons whose names are to the grand jurors unknown, unlawfully to evade and to aid others to evade the requirements of" the Selective Service Act, and further that they "should aid, abet, counsel, command, induce and procure divers persons whose names are to the grand jurors unknown, unlawfully to fail and neglect fully to perform duties required of them in the execution of" the said Selective Service Act.

The overt acts enumerated in respect of both counts all consisted of sundry alleged doings of one or both of the plaintiffs in error at what is described as "a mass meeting of so-called conscientious objectors held" within the Southern district of New York.   Said overt acts may be summarized thus: Cheyney was chairman of said mass meeting; both plaintiffs in error and other persons, whose names are unknown, distributed certain pamphlets entitled "Conscientious Objectors" at the said meeting, Fraina being the author of said pamphlet, the same purporting to be issued by the "League of Conscientious Objectors," and that Fraina at the said meeting and in a speech there delivered uttered certain words set forth at length.

The applicable language of section 37 is that, "if two or more persons conspire either to commit any offence against the United States, * * * and one or more of such parties do any act to effect the object of the conspiracy, each of the parties" shall be fined or imprisoned.

Section 332 provides: "Whoever * * * aids, abets, counsels, commands, induces or procures" the commission of "any act constituting an offence in any law of the United States" is a principal.

Section 6 of the Selective Service Act contains these material words: "Any person who * * * evades or aids another to evade the requirements of

this act, * * * or who, in any manner, shall fail or neglect fully to perform any duty required of him in the execution of this act," shall be guilty of a misdemeanor.

Plaintiffs in error were acquitted upon the first count and convicted on the second, and, sentence having been passed upon them, they took this writ.

Winter Russell, of New York City (Horace L. Cheyney, of New York City, of counsel), for plaintiff in error Cheyney.

Boudin & Liebman, of New York City (Louis B. Boudin, of New York City, of counsel), for plaintiff in error Fraina.

Francis G. Caffey, U. S. Atty., of New York City (Vincent H. Rothwell, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). This record presents several most substantial defects in practice:

[1] 1. There is no bill of exceptions. Both parties have agreed to call what is probably a transcript of the stenographer's minutes by that name; but giving it the requisite name does not make it the lawful thing. The consent was worthless, and it is of grace only that we consider the points argued. On this matter we spoke plainly in Linn v. United States, 251 Fed. 476, —— C. C. A. ——.

[2, 3] 2. The record is also incumbered with what are called "Additional and Supplemental Assignments of Error." Certain errors were assigned, and presented with the application for writ and citation, as required by rule. Thereafter it seems certain, from the internal evidence of the transcript, that counsel combed through the minutes, specified anything they did not like, whether excepted to cotemporaneously or not, called the result of their labors "additional and supplemental assignments of error," and filed the document without any leave of court, so far as shown. It also is worthless, first, wholly, because no leave is shown; and second, in so far as the assignment rests on no exceptions, even if leave had been obtained.

We may, under the familiar rule of court, notice "a plain error not assigned"; but these additional assignments do not per se require us to notice them at all, except to disapprove their existence.

[4] 3. A number of the exceptions and following assignments rest on the refusal of the trial judge to repeat to the jury, when rephrased in a request, what he had already correctly stated in substance. When the law has once been fairly presented to the jury, "neither party has a right to complain because the trial judge preferred his own language to that of counsel." Green v. United States, 240 Fed. 949, 153 C. C. A. 635. To such assignments no further attention need be paid.

The facts shown at trial were few, and substantially uncontradicted. Outside a building was a poster announcing a meeting within; inside a large audience and a platform, on which sat defendant Cheyney who presided, defendant Fraina, and one Sonnenschein. Of those present very many were obviously of the age rendering them liable to conscription. Men moved through the audience, distributing gratis a printed speech by Fraina, obtaining the same from the platform on which defendants sat.

Cheyney opened the proceedings with a speech. Most of the sentences began with "I object," and his objections extended to the war with Germany and every step taken to make it effective, also to all war, because "you cannot achieve anything by force." He also denied "the right of any individual to compel me to do anything against my will," and exhorted his hearers "not [to] go across the seas in order to fight a foreign fight" but to fight autocracy "through industrial and economic means," and closed with the following peroration:

"Those are the grounds upon which I am a conscientious objector: On the ground that it is immoral to fight at all; on the ground that it is each individual is the master of his own mind, the captain of his own soul; that it is his to say as to whether he should do a thing or not do it. Those are the grounds on which I am a conscientious objector.

"Now, I won't take your time any longer, because there is a man to follow me, a man you all know, a man much more eloquent than I, who can point home in words more eloquent than I can the tyranny of big business in this country. I have the pleasure of introducing to you Mr. Louis Fraina, the New Internationalist."

Fraina then spoke at greater length, though not differing in universal objection from Cheyney. He said inter alia:

"We find they are going to conscript the conscientious objector. The conscientious objector refuses to be conscripted. It is against his principle, it is against his conscience, to serve in the army, and to perform military service, * * * but we are told in a measure if we persist in our objection, in the measure we cling to our principles, we are hampering the process of war, that we are helping to kill our own boys at the front.

"In the first place, that is a dastardly lie. In the second place, it is immaterial to me what happens at the front; it is immaterial to me what happens in a war which is imposed upon me, because in this case one must exercise a sense of proportion. * * * The government in this conscription law recognizes only those conscientious objectors that are affiliated with some recognized religious association, cult, or creed, such as the Quakers, for instance. Now, the other conscientious objectors are not recognized by the conscription law. * * * But since when must a man necessarily belong to a church, belong to a creed, a recognized creed, before he can have a conscience? * * * The government, in making conscientious objection to war a part of religion or creed, is placing a premium upon religion. It is placing a premium upon the superstitions of religion, it is placing a premium upon the passive attitude of the religion of the Quakers. * * *

"Now, the nonreligious conscientious objector is a distinctly different type. The nonreligious conscientious objector is one of the people, a social being, and as such has an objection to war. I do not object to war because my father was a Quaker and I inherited his religion. I object to war because I have acquired my conscientious convictions, I have acquired the objection by experience, by thinking, action, and I have felt it flow into my conscience and my life.

"The government is perfectly content in placing a premium upon religious conscientious objection, and penalizing the nonreligious ones, because the system of things that this government represents, the infamous system of capitalism, has nothing to fear from the religious conscientious objector; * * * but it has everything to fear from the nonreligious, from the social, conscientious objector, because the nonreligious conscientious objector is not interested in his conscience alone, but interested in his social principle that his conscience represents, and is trying to overthrow a system of things that produces war and produces other evils. * * *

"We are not going to be trampled on; we are not going to take fear. We are not going to be exempted. We are going to be penalized; we are going to be compelled, if they can compel us. I say right now that they cannot con-

script a conscientious objector. They cannot do it, because we have made up our minds we are not going to be conscripted."

The Frania pamphlet, distributed as above shown, declares:

" * * * The conscientious objector refuses *any* participation in this war, and his refusal is based, not alone upon the objections of his individual conscience, but upon the general social necessity of striking at war and at the reactionary purposes that war promotes. Alternative service is as necessary a factor in war as actual military service at the front. They are inseparable. They are equally objectionable. * * *

" * * * The Red Cross is as necessary a factor in war as munitions and soldiers. It heals men and then sends them to the front to continue the horrible business. The Red Cross, fundamentally and essentially, is neither sentimental nor humanitarian—its purposes are strictly military. Under these circumstances the conscientious objector will have nothing to do with the Red Cross or similar organizations. * * *

"The conscientious objector opposed the Conscription Law, and after it was passed agitated for its repeal. But conscription has been put through, and it now remains for the conscientious objector *as an individual* to emphasize his objections and his principles by individual action."

This closed for the prosecution. Defendants showed that Sonnenschein organized the meeting, was the "organizer" of what he called "the League of Conscientious Objectors," and on behalf of and in the name of the League had telegraphically demanded of the Secretary of War as follows:

"Representatives of 3,500 conscientious objectors in New York whose idealism compels them to decline all forms of military service, we ask: What of the conscientious objector?"

This was done to get, if possible, the Secretary's view, in order to advise the meeting at which, by arrangement with Sonnenschein, Cheyney and Fraina were to speak. They both knew about this telegram; and both testified, declaring that they had personally registered in obedience to the Service Act, and considered the meeting as one only to "determine the status of the conscientious objector, and to gain as good a status as possible from the government."

The issue thus raised was put to the jury by the trial judge as follows:

"Now these defendants say that this meeting was held for the purpose of establishing a better status for the conscientious objector; that this telegram was sent and these speeches were made at the meeting for that purpose. The government says that was not the purpose. * * *

"Therefore you will look to the speeches as uttered and see what they said, and see from what they said whether those speeches were delivered in an effort to get a better status established, or whether they were delivered in a violent protest against the law, and in order to induce other people to refuse to be bound, or refuse to act or accept the law, and refuse to do their duty which is required by this law, and that is exclusively within your province."

The verdict plainly imports that defendants were not guilty of conspiring to evade their own military duties, probably for the simple reason that they had with commendable prudence performed them up to date, but were guilty of unitedly attempting to counsel, or procure by counsel, others to defy conscription for any form of war work, and to justify such defiance by proclaiming themselves "nonreligious conscientious objectors."

The contentions in this court justifying notice are: (1) The second count charges no crime; (2) the crime sought to be charged was not proved; (3) the trial court erred (a) in admitting evidence, (b) in practically permitting the jury to infer guilt from the character of defendant's speeches, and thereby (c) invading the right of free speech.

[5] (1) The contention that the count on which plaintiffs in error were convicted states no offense rests (in so far as it requires notice) on the interpretation and application of section 332, Criminal Code. The history of that section is sufficiently summarized in Rooney v. United States, 203 Fed. 932, 122 C. C. A. 230.

What the count under consideration seeks to charge is plain enough, viz. it is an offense against the United States to evade the requirements of the Selective Service Act, therefore it is another offense under section 37 to conspire so to evade; but every one who evades being a criminal, every one who counsels evasion is also a criminal, under section 332, and those who unite for the purposes of so counseling are conspirators, and as such liable to the pains and penalties of section 37, though the wrongdoing is only reached by combining sections 37 and 332 to define the nature of the crime and pointing to the Service Act to discover the offense, which is the object of the criminal conspiracy.

It is said that this goes beyond the law, and charges the accused with "conspiring to do something which is not made a crime by" the sixth section of the Service Act. Upon reason, we perceive no ground for the assertion that the offense which is the ultimate object of the conspiracy must be found in a single enactment; all conspiracies, whether to effect directly or by a procuration the most devious the commission of an offense against the nation, are essentially alike, and the very object of section 332 was to make a principal offender out of (inter alios) one who contrived to have another commit a crime which the contriver was not intending himself to run the danger of. If the contrivance takes the form of that mental combination for a common purpose which is conspiracy at common law, and is accompanied by the necessary overt act, it makes (under sections 37 and 332) no difference whether the object is to be attained directly or through others; and to say that the object is not, e. g., to evade the Service Act, but to procure or counsel others so to evade, is no more than juggling with words.

As for authority it is sufficient to say that the indictment in Goldman v. United States, 245 U. S. 474, 38 Sup. Ct. 166, 62 L. Ed. 410, was the legal equivalent of the one here complained of, and was duly sustained over similar objection.

[6, 7] (2) It is asserted that, assuming all the evidence to be competent and relevant, there was not proof, measured by the standard of criminal causes, of a conspiracy. This proposition seems to separate into two parts—one, that the proper course of trial in conspiracy cases was not pursued; the other, that no reasonable jury could have found such a verdict. Wherefore another trial should be granted.

The essence of a conspiracy is the combination, and the act of combining should ordinarily be first made to appear, before proving the acts and declarations of the coconspirators, including oftentimes those of persons not indicted—usually the "persons to the grand jury unknown." Yet even this is but order of proof, and within the discretion of the trial judge; it is only reviewable when abuse of discretion injurious to the accused is shown upon the review.[1]   The law (as distinguished from discretionary trial practice) of conspiracy has been too lately summarized to need more than mention. United States v. Rabinowich, 238 U. S. 86, 35 Sup. Ct. 682, 59 L. Ed. 1211.   This case is one of the simplest instances of proper proof in limine of combination ever brought to a court's attention.   If, as per advertisement, an audience is gathered before a platform containing intending speakers, and is called to order by a chairman, who announces the object of the gathering, again, as per advertisement, it is impossible not to infer a combination in thought among the platform occupiers and their helpers.   Sonnenschein and the pamphlet distributors were plainly proved, and with unusual simplicity and accuracy, as conspiring—i. e. combining—about something with the plaintiffs in error, who certainly have no cause of complaint on this head.

Considering the language by which the object of the combiners in calling the meeting was illuminated, the suggestion that an American jury of intelligence could not reasonably come to the conclusion announced would require nothing but summary dissent, did not the contention and the earnestness of the contenders excellently illustrate an erroneous view of criminal appeals, and explain the modern inclination to disguise a stenographer's transcript as a bill of exceptions.

[8] Plaintiffs in error are really objecting to the weight of the evidence, and appealing to this court to override the jury's verdict, and therefore they print every word of the trial.   We are not permitted to be concerned with that matter.   Appellate courts, unless given power by statute, do not sit to correct the possible errors of the jury, but those of the court.   While it is the jury's duty to take the law from the court, and to apply that law to the facts as they find them (Sparf v. United States, 156 U. S. 51, 15 Sup. Ct. 273, 39 L. Ed. 343), and it is the court's duty to see that there is some evidence tending to prove every element of the crime alleged (Clyatt v. United States, 197 U. S. 207, 25 Sup. Ct. 429, 49 L. Ed. 726), the jury's supremacy as to facts, including the inferences of fact drawn from proven phenomena, is unquestioned.   Indeed, even as to matters of law, Story, J., who is credited with establishing our present doctrine, instead of the theory that in criminal causes the jury judges both the law and the facts, admits the jury's "physical power," though not the "moral right," to disregard the court's law.   United States v. Battiste, Fed. Cas. No. 14,545, 2 Sumn. 240.   If a verdict of acquittal in the teeth

[1] This is well summarized in Bishop's New Criminal Procedure, vol. 2, § 227 et seq. The court's discretion should ordinarily be exercised in repression of the prosecutor's tendency to prove what he subsequently calls "overt acts," and then ask the jury to infer the conspiracy from the acts. But no hard and fast rule can be laid down beforehand.

of the law be rendered, it must stand unreversed and unpunished, since Bushell's Case, Vaughn, 135; and a verdict of conviction, though resting on inferences of fact that the judges would not draw, is assailable in an appellate court, only by demonstrating that reasonable men could not, as matter of law, be convinced beyond a reasonable doubt. The feat is always difficult, and we are far from finding it possible in this instance.

[9] (3a) The objections to admission of evidence, certainly fundamental, if well founded, are that Cheyney's speech, the Fraina pamphlet, and all of Fraina's oration (not merely the words specified as an overt act) were put before the jury.

The argument is based on a wholly inadmissible reading of Hyde v. United States, 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614, viz. that because it was there pointed out that an overt act is "more than evidence of conspiracy," and is a part of the crime, therefore nothing can be proven, that might have been laid as an overt act, that is not so charged. No such doctrine is supported by the decision cited; on the other hand, the prosecution is not confined to the overt acts charged (Houston v. United States, 217 Fed. 858, 133 C. C. A. 562); and a fortiori there can be no legal complaint of testimony tending to show the object of the conspiracy, which evidence one may call an overt act, if so minded.

[10] (3b and 3c) The mental attitude evident throughout the conduct of defense below, and argument here, is suggested rather than plainly stated by the points that it was error to permit the jury to infer guilt from the speeches, that in so doing defendants were tried for their words, and such procedure invades the right of free speech.

We think the contention may be thus summed up: If there was a meeting of minds, it was not actually productive of any breach of peace; no one was shown to have refused physical obedience to the law; it was all words; and men cannot constitutionally and lawfully be punished for words, especially when the language relates to rights based on the moral sense—i. e., the "idealism"—of the "nonreligious conscientious objector."

The matter at bottom is political, not legal. Men can be punished for words, if the Legislature so decrees, within constitutional limits. Men commit crimes when they counsel or procure others to sin against the statute law, and they also commit crimes when they confederate to effect that object, and yet it is difficult to imagine any more suitable or usual method of procuring or counseling than by speech. In this inaccurate sense men have very often been punished for words by statutory enactment.

The free speech secured federally by the First Amendment means complete immunity for the publication by speech or print of whatever is not harmful in character, when tested by such standards as the law affords. For these standards we must look to the common-law rules in force when the constitutional guaranties were established and in reference to which they were adopted.[2] By legislative action the

---

[2] This definition by Judge Cooley (Const. Limitations [7th Ed.] p. 605) has been often adopted, most lately perhaps in People ex rel. Atty. Gen. v. News-Times, 35 Colo. 253, 84 Pac. 912.

boundaries of unpunishable speech have doubtless and often been much enlarged; but the constitutional limit remains unchanged, and what the Legislature has done it can undo. Legal talk-liberty never has meant, however, "the unrestricted right to say what one pleases at all times and under all circumstances." Warren v. United States, 183 Fed. at 721, 106 C. C. A. 156, 33 L. R. A. (N. S.) 800. Nothing said to the jury by the court below in this case went beyond the limits thus stated, and there was no error.

Complaint as to inferring guilt from speeches, or letting men be found guilty therefore, when or if the speeches only expressed moral principles and social aspirations, is really objecting to the statutes. The statutes in question here, like most others, are of general application; they must be so unless exceptions of equal authority are also statutory. They operate alike on the religious, the atheist, and the unthinking.

While "religion is not defined in the Constitution" (Reynolds v. United States, 98 U. S. 162, 25 L. Ed. 244), and the "law knows no religion and is committed to no dogma" (Watson v. Jones, 13 Wall. 728, 20 L. Ed. 666), yet "directly or by clear implication" every American Constitution "recognizes a profound reverence for religion and an assumption that its influence in all human affairs is essential to the well-being of the community" (Holy Trinity Church v. United States, 143 U. S. 465, 12 Sup. Ct. 511, 36 L. Ed. 226). Nevertheless the most profound religious conviction that compliance with statute is wrong will not by law save any one from conviction by a petty jury for violating that statute. Cf. Reynolds v. United States, supra; Davis v. Beason, 133 U. S. 333, 10 Sup. Ct. 299, 33 L. Ed. 637.

The regulations promulgated under the Service Act fully recognized the spirit of the above quotations, although the executive was under no legal compulsion so to frame them. Rule 14 reserved for noncombatant service members of any "well-recognized religious sect or organization," and no others, and after that the court as such was concerned only with the law as it stood, not as some persons thought it should be.

If one moved by religion—i. e., by his "recognition of God as an object of worship, love and obedience" (People v. Board of Education, 245 Ill. 334, 92 N. E. 251, 29 L. R. A. [N. S.] 442, 19 Ann. Cas. 220) —can decline or refuse service only secundum regulum, certainly no one else can do otherwise. "Idealism" must mean a self-created standard of conduct or desire, and is therefore subject to instant change or destruction by its creator. Idealism "compels" its possessor only as does any other appetite or desire. Nor can conscience —said to be "that moral sense which dictates right and wrong" (Miller v. Miller, 187 Pa. 572, 41 Atl. 277)—claim any higher rights than religion.

[11] Measured by these rules, if the speeches of plaintiffs in error furnished evidence of an intent and an effort to induce and procure those who listened to violate the law, i. e., to evade or neglect their military duties, then those speeches alone might carry to the jury conviction beyond reasonable doubt; and if religion, and a conscience pre-

sumably begotten of religion, afforded no legal excuse for evasion or neglect, it is certain that irreligion and idealism are upon no higher plane of privilege.

Indeed, to say that one who speaks, and does nothing else, cannot be or should not be convicted *for* his speech, is inaccurate, and evades the point. These men on this record were quite possibly convicted *by* their speeches, as evidence of their criminal intent to procure violations of statute; but that is a very different thing from conviction *for* speaking.

It has often been urged by the preacher that man is judged by every word that proceedeth out of his mouth; human law usually treats speech only as evidence; if as such these speeches persuaded the jury of guilt, nothing happened which is either surprising or assignable as legal error.

Judgments affirmed.

