## FELDER v. UNITED STATES. *

(Circuit Court of Appeals, Second Circuit. December 7, 1925.)

### No. 48.

**1. Bribery ⬤⟊1(2)—Bribery of assistants to Attorney General within statute.**

Penal Code, § 39 (Comp. St. § 10203), prohibiting bribery of "officers of the United States" or persons "acting for and on behalf of the United States," held to cover Attorney General, United States attorney, and assistants to the Attorney.

**2. Bribery ⬤⟊1(2)—Bribe offered to officer or agent of Department of Justice after arrest within statute.**

A bribe offered, after proceeding was begun by arrest, to any officer or agent of the Department of Justice, to stay or abort prosecution, is within Penal Code, § 39 (Comp. St. § 10203), relative to bribery of officers.

**3. Conspiracy ⬤⟊28 — Conspiracy could be formed to procure United States attorney to dismiss prosecution.**

A United States attorney has the right to nolle any indictment, and conspiracy to corrupt such official by procuring him to dismiss criminal prosecution is within Penal Code, § 37 (Comp. St. § 10201).

**4. Criminal law ⬤⟊304(17)—Judicial knowledge taken that power of Department of Justice officials to procure presentment or ignoramus from grand juries is great.**

The Circuit Court of Appeals takes cognizance of the fact that power of lawfully constituted officials of the Department of Justice to procure either a presentment or an ignoramus from grand juries is very great.

**5. Bribery ⬤⟊1(2)—Corruption of officers on whom grand juries depend for guidance and information within scope of bribery statute.**

To corruptly prevent or influence grand jury's action by controlling officials on whom grand juries must depend for guidance and information is within prohibitory scope of Penal Code, § 39 (Comp. St. § 10203), relative to bribery of United States officers.

**6. Conspiracy ⬤⟊27—Overt act charged need not be substantive offense of itself.**

In proceeding for conspiracy under Penal Code, § 37 (Comp. St. § 10201), overt act charged in indictment need not be substantive offense of itself.

**7. Conspiracy ⬤⟊43(5)—Not necessary to allege how overt acts charged would tend to effect conspiracy's object.**

Handing over to one conspirator money collected by or from men threatened with indictment, in order to prevent indictment, is sufficient overt act, under Penal Code, §§ 37, 39 (Comp. St. §§ 10201, 10203), and it is not necessary to allege how it would tend to effect conspiracy's object.

**8. Witnesses ⬤⟊255(9)—Minutes of grand jury properly used to refresh memory of witness as to testimony before grand jury.**

It was not error for prosecutor, on cross-examination, to use minutes of grand jury contemporaneously made to refresh witness' memory as to testimony given before grand jury.

**9. Criminal law ⬤⟊1159(2)—Circuit Court of Appeals cannot pass on weight of evidence, question of reasonable doubt being for jury.**

The Circuit Court of Appeals cannot investigate evidence, to pass on its weight, question of reasonable doubt being for the jury; but its duty is merely to declare whether jury had right to pass on what evidence there was.

**10. Conspiracy ⬤⟊48—Evidence held to make jury question as to conspiracy to corruptly influence persons acting for United States.**

In prosecution under Penal Code, § 37 (Comp. St. § 10201), and section 39 (Comp. St. § 10203), for conspiracy to corruptly influence persons acting for United States to dismiss criminal prosecution, evidence held sufficient to go to jury.

In Error to the District Court of the United States for the Southern District of New York.

Thomas Felder was convicted of conspiracy, and he brings error. Affirmed.

The indictment in a single count, and with numerous stated overt acts, charged that Felder, together with Gaston B. Means and one Jarnecke, did conspire with six persons named, but not indicted, and "divers others" to the "grand jurors unknown," to promise, etc., to sundry persons named, who at the time were either "officers of the United States" or persons "acting for and on behalf of the United States in an official function," certain large sums of money, with intent to influence the "decision and action" of each of said officials in a "question, * * * cause and proceeding" then pending before them and each of them.

Of the six unindicted conspirators named, all but one had been engaged in an affair called throughout this record the "glass casket 'scheme," an enterprise whose headquarters seem to have been in Chicago, which persons in authority (and presumably in the

*Certiorari denied 46 S. Ct. 348, 70 L. Ed. ——.

Postal service) thought was a "scheme to defraud," within section 215, U. S. Penal Code (Comp. St. § 10385). The sixth named conspirator (Padorr) testified for the prosecution, and by his own account was one of the persons instrumental in bringing Means and the "glass casket" people together.

Means had been an employé of the Department of Justice, and on this record was a great boaster of his own importance. Jarnecke (who also testified for the prosecution) acted by his own account as a sort of "tout" or business getter for Means, and the business procured involved the alleged use of "influence" in dealing with United States officials and employés of many kinds. Liquor naturally was an attractive field for such "influence" mongers. See Means and Jarnecke v. United States, 6 F.(2d) 975, for one instance of what Means did.

In September, 1922, Jarnecke learned that the "glass casket" men were being proceeded against in Chicago for their alleged "scheme to defraud." He asked Padorr, who lived in Chicago, whether the latter knew any of them. Padorr did know one at least, and by such means the "glass casket men" and their Chicago attorney, one Kostner (ill before trial below and now deceased) were brought to meet Means.

It is not necessary to dwell upon the unsavory testimony regarding their negotiations. We sum it up by saying that it seems to us proven quite clearly that the casket men named and their attorney, Kostner, did agree that Means should be paid $65,000, in consideration of which the warrants upon which they had been arrested would be quashed, the books of what was alleged to be the "scheme" would be rescued from government seizure, letters would issue from the "Department of Justice completely exonerating each and every one" of the party, who would then "be able to go back to business again." Means represented, and Jarnecke spread the tale, that these marvels would result from the judicious distribution of much (how much was never stated) of the $65,000 among persons ranging in rank from members of the Cabinet to assistant United States attorneys in the city of New York.

It may be here noted that this indictment, therefore, is for a conspiracy (section 37, [Comp. St. § 10201]) to corruptly influence officers of the United States and persons acting for and on behalf of the United States, viz. the Attorney General, the United States attorney for the Southern District of New York, and two of the latter's assistants (section 39 [Comp. St. § 10203]). The relation of Felder to this arrangement will be treated of in our opinion; suffice to say now that there is no evidence that Means even attempted to perform the miracles which the named, but unindicted, conspirators and Kostner, their attorney, hoped he would do. Indictment was found, and of the five "casket men" named in this indictment Getzler seems prudently to have remained in Europe; Rosenblatt pleaded guilty; Sideman and Safir were convicted, and the remaining one does not figure in this story. Safir, Sideman, and Rosenblatt testified for the prosecution in this case; result was that Means and Felder alone stood trial under this indictment, for Jarnecke pleaded guilty, and turned state's evidence.

After a lengthy trial the jury found both men guilty, but recommended Felder for "extreme clemency." Accordingly no prison sentence was passed upon Felder, but from a heavy fine he took this writ. Means took out a writ, but did not press it.

Frank P. Walsh, Robert S. Johnstone, and Emanuel Harris, all of New York City (Thomas W. Hardwick, of Atlanta, Ga., and James Hamilton Lewis, of Chicago, Ill., of counsel), for plaintiff in error.

Emory R. Buckner, U. S. Atty., of New York City (Hiram C. Todd and Clifford H. Byrnes, Sp. Asst. Attys. Gen., of counsel), for the United States.

Before ROGERS, HOUGH, and HAND, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). Although seriously argued, the objections made against the form of indictment and technique of trial require no more than reference to well-established legal principles.

[1] The indictment plainly averred that the persons whose corruption was to be effected according to the scheme proposed were officers of the United States or persons acting for the United States. The first category is of persons acting under appointments "embracing the ideas of tenure, duration, emolument, and duties" (United States v. Hartwell, 6 Wall. 385, 18 L. Ed. 830), and would evidently cover the Attorney General and United States attorney. Whether it would also cover the assistants to the attorney need not be decided, for whether they are or are not like the appraisers referred to in Auffmordt v. Hedden, 137 U. S. 310, 11 S. Ct. 103, 34 L. Ed. 674, they are assuredly persons "acting for and on behalf" of the gov-

ernment, and therefore within the purview of section 39 (Comp. St. § 10203).

[2] It is also sought to bring this case in line with, e. g., In re Yee Gee (D. C.) 83 F. 145, holding that the predecessor of this statute (R. S. § 5451) did not apply where a bribe was offered to one who was not actually exercising an official function or duty, but *might* be called on so to act. We are not concerned to ascertain the correctness of the case cited; let that be assumed, but it remains true that in September, 1922, some of the "glass casket" men had been arrested and held to bail, the Department of Justice had then acted, and every official in the department was in a sense acting also. We wholly reject the argument that, after the proceeding had begun by the initial arrests, a bribe offered to any officer or agent of the department 'to stay or abort the prosecution would not be within the statute.

[3] Further is the indictment assailed because, as is argued, no United States attorney (and therefore no assistant) can dismiss a criminal proceeding; for such dismissal is a judicial act, and no conspiracy could therefore be formed to do something that such officers were inherently incapable of doing. This objection is thought to rest on United States v. Corrie, Fed. Cas. No. 14,869. As to that case we prefer as authority a decision in this circuit (United States v. Watson, 7 Blatchf. 60, Fed. Cas. No. 16,652), holding the United States attorney has the right (unless collusion be shown) to nolle any indictment.

[4, 5] It is not, however, necessary to pursue the subject through other and more modern instances, for the essence of the charge in this indictment is that a conspiracy was formed to *prevent* by corrupt means the finding of *any* indictment against the "glass casket" men; and any lawyer knows, and we take cognizance of the fact, that the power of the lawfully constituted officials of the Department of Justice to procure either a presentment or an ignoramus from grand juries is, to say the least, very great indeed. To corruptly prevent or influence grand jury action, by controlling the men upon whom of necessity grand juries must almost always depend for guidance and information, is to poison the very wells of justice, and in our opinion clearly within the prohibitory scope of section 39.

[6] The final attack upon the indictment is thus put: No overt act pleaded *"could* tend to effect the object of the conspiracy," and this is elaborated to mean that "the only act which could possibly have been in furtherance of the alleged conspiracy was an approach by one of the conspirators to one of the officers named in the indictment for the purpose of bribing him." We notice this, because it seems to us an apparently serious attack upon the fundamentals of the law of conspiracy. If it were true, a conspiracy to perform a criminal act could scarcely be charged, unless an overt act were charged that was the substantive offense. That such is not the law needs nowadays no citations in support.

[7] In this case it is enough to note that several of the overt acts recited consist in handing over to this plaintiff in error the money collected by or from the men threatened with indictment, in order to effect their object; i. e., corrupt prevention of formal indictment. Such an act plainly "manifests the intention of the doer to commit the offense," and it is not necessary to allege *how* that action would tend to effect the conspiracy's object. Rumely v. United States (C. C. A.) 293 F. 532, at page 550.

[8] The assignments of error resting on rulings as to evidence and conduct of the prosecution we have carefully examined, but find it necessary to mention particularly one only. The prosecutor in the cross-examination of some witnesses called their attention to what they had previously said before the grand jury, using for that purpose the minutes of that body. Doubtless the use of that particular record is to be limited by a carefully exercised judicial discretion in the trial judge; but where the record was contemporaneously made, so that it could have been used to refresh the recollection of the witness, such use is proper. We have so ruled in Bosselman v. United States, 239 F. 82, 152 C. C. A. 132, relying on Putnam v. United States, 162 U. S. 687, 16 S. Ct. 923, 40 L. Ed. 1118. The bald fact that the memory refreshing words are found in the records of a grand jury is not a valid objection. United States v. Smith (C. C.) 47 F. 501. We cannot find that this rule was infringed in the trial of this cause.

What seems to us the principal contention on this review is thus assigned for error, viz.: There was "no legal and competent evidence to sustain the charge in the indictment against" Felder. Wherefore a verdict should have been directed in his favor. This is amplified to mean that Felder might admit that Means and the "glass casket crowd" did conspire to do just what the indictment charges, and yet assert (as is asserted) that

he was but an attorney, employed like any counsel for the defense of Rosenblatt et al. It is urged that, however open to criticism are Mr. Felder's personal manners or professional ethics, he had no interest in those accused of the "glass casket" fraud, except to "get them off," if he could, and be paid for it as well as possible.

As part of this argument it is most strenuously urged that the present indictment is the result of hatred by convicted clients of Felder, who have vented their spite by trying to tar him with their own pitch; for he was not only attorney for the "casket crowd," but for Means and Jarnecke in the case above mentioned. We have fully recognized the seriousness of the accusation made and the result reached below for this plaintiff in error, a man of mature age, a lawyer of widely extended practice and well known at the bars of courts in several states. For him it is a contest for professional existence; but for the community at large and for the legal profession in particular the matter is scarcely less serious.

It is of little moment that this record yields no proof, and not even suspicion, that any attempt at bribery was actually made; but, if men trading on their connection with one of the great departments of the government, or members of the bar who are always officers of the court, can profitably promise to do a tithe of the things here shown to have been promised, the bald fact that such promises can gain credence, even among the baser sort, is a cancerous product of our times. It is therefore with a sense of laboring for the sake of the community, for the sake of the profession to which plaintiff in error still belongs, as well as for the sake of that plaintiff, that we have investigated the testimony herein.

[9, 10] That we cannot investigate it to pass on the weight of the evidence is a point too often decided to need citation; nor can we, after investigation, use such doubts as may assail us to disturb the verdict of the jury. That reasonable doubt which often prevents conviction must be the jury's doubt, and not that of any court, either original or appellate. Looker v. United States, 240 F. 932, 153 C. C. A. 618. Cf. Fraina v. United States, 255 F. 28, at page 34, 166 C. C. A. 356. Our duty is but to declare whether the jury had the right to pass on what evidence there was.

It puts clearly the vital point decided by the jury to quote a portion of the charge. The jurors were told, in a manner calculated to attract special attention: "Unless the jury find that the defendant Felder entered into and was a party to an agreement to give, offer or promise money [to the persons named in the indictment] to influence his or their official action with reference to the so-called glass casket case, they must acquit the defendants." And again: "An essential and necessary element of the crime charged is that there was a conspiracy or agreement to give, offer or promise money to one or more of the federal officials to influence his actions in the glass casket case. Even if the defendant Felder had an agreement or understanding that he would use his influence with the officials mentioned, or some of them, that would not make him guilty of the crime charged. Unless he was a party to an agreement to give, offer or promise money to one or some of the federal officials mentioned he must be acquitted."

These instructions assuredly went as far as any one could ask; they require a finding of criminal intent according to a very literal reading of the indictment, and they eliminate from our consideration what may be regarded as a quite possible aspect of the evidence, viz. that, although the "glass casket crowd" parted with their money because they expected Means, at least, to be as corrupt as he promised to be, neither Means, Felder, nor Jarnecke ever intended to corrupt or try to corrupt anybody except themselves. It might be argued that their intent was merely to swindle swindlers; so that, whatever might be the rascality of all parties in the enterprise, the only persons who intended to violate section 39 were those who had already violated section 215.

It is evident enough that all who had stood trial for the glass casket scheme, with varying results, testified willingly against Means and Felder. In some curious way they thought themselves unjustly treated, because they had paid out so much money and then been indicted after all. This attitude was itself evidence; and the jury's finding was (to put it one way) that there were such promises of nonindictment, and this finding was made over the assertions of both Means and Felder that no one had ever made any such promise to any one.

Having noted our opinion that the conspiracy charge was proven against Means, Jarnecke, the "glass casket men," and their Chicago attorney, Kostner, the question narrows to this: Was there sufficient evidence to go to the jury to show that Felder ever joined that particular conspiracy made in the latter part of September, 1922? There is confessedly no direct evidence that he ever said,

in the hearing of any witness, that the $65,000 of "casket money," or any part of it, was to be used for purposes of corruption. The verdict rests on inferences.

The more important testimony tending to implicate Felder in what Means was convicted of, and what Jarnecke and the casket men confessed, may be ranged under these heads: (1) Felder's relation to the $65,000; (2) his talks, and demeanor while talking, with Jarnecke and the casket men; (3) his relations with Means, and his own treatment, while testifying, of that relation; (4) the nature of the professional labors undertaken by him for the "glass casket crowd," as related by himself.

First. As to the $65,000, the evidence is direct that, when the first money was paid, about the middle of October, 1922, $10,000 came to Jarnecke, who by Means' order paid $8,000 of it to Felder, and told him it came from the casket men. Felder received it, seemingly as a matter of course, but never accounted for it as part of his "casket" fee, and in the following March denied that he knew Jarnecke, or had ever heard of him. This payment was in cash, and so was $47,800, which was paid to Felder's partners, in Means' presence, by Kostner, and receipted for in the name of Felder's firm by one Spielberg, who had been a partner less than a month. The form of receipt was for "services rendered and to be rendered in *above action*." At that time there was no action pending, no indictment having been found.

Of this $47,800, only $33,800 was entered in Felder's books as they now stand; but above that entry are erasures, showing that other entries had been made, which erasures have never been explained. But Felder apparently received $23,800, plus $8,000, yet he said, when reproached by some of the casket men for having failed in preventing an indictment, that "we here" (meaning his firm) got only $25,000; the rest, said he, "went to Chicago," according to one witness, and to the "other fellows in Washington," according to another. The former was Spielberg's story, who said that Kostner took away from Felder's office $24,000 of the $47,800 that Safir had just produced in his presence; while Safir's story is that Means was in Felder's office to get the money, and left the room where the transaction occurred holding the money. There was also direct evidence that shortly thereafter Means had large sums in cash, wherewith he paid Jarnecke and Padorr for their services in "touting."

The attitude toward this considerable sum of money assumed by Means and Felder on the witness stand was evidence. Means substantially asked the jury to believe that all the money was for the legal services of attorneys led by Felder; but he did not deny having taken a hand in the matter, and why he should have done anything about it, according to his own story, was something at which the jury might easily have wondered. Felder likewise asserted that all the money was for legal services, yet according to his statement he and his partners received less than one-half of it; but why the balance of so large a fee should have been paid to anybody, and least of all why Kostner should have received $24,000 of it, was as hard to explain on Felder's evidence as it was on that of Means to understand the charitable or altruistic motives actuating him.

Further, it was admitted that Felder's firm procured an assignment of property which should have realized $5,000 in addition to the amounts actually paid. What this prospective addition to Felder's share of legal charges represented was for the jury's consideration.

Second. In his talks with Jarnecke and the persons accused of the casket fraud, plaintiff in error always, according to their testimony, spoke, not of defending against indictments, but of preventing the finding of indictments. The talks were brief. They were from a professional standpoint utterly inadequate for gaining any knowledge of the details of the plan said to be a fraud on the part of most of the men who called on Felder. The direct evidence was full to the effect that plaintiff in error always recognized that these men came to him from and through Means, and that his talk was not of proving their innocence, but of showing his own power to avert prosecution and punishment through his friendships and their resulting influence.

Third. The testimony for the prosecution depicted Means as a person willing and boasting of ability corruptly to exercise influence, and as one using his lawyer friend, Felder, as a cover, or, as the witnesses term it, an "out"; i. e., one in private professional practice, and not identified, as Means falsely pretended he was, with the staff of the Department of Justice. Means was not a member of any bar.

The position of the plaintiff in error on the witness stand was to minimize, and, indeed, almost wholly to deny, any relations of amity with Means, except that of casual acquaintance. The jury might well have re-

flected, if Felder's relations with Means were what the former claimed, why did Means send clients to Felder; while, if the relations were what Means intimated they were to those whom he did send to Felder, the jury might well have asked how Felder could fail to be familiar with all the details of the plan of which the jury found Means guilty.

Fourth. Since, according to the defense, this $65,000 was no more than a fund wherewith to pay lawyers for legal services, the jury were by the testimony invited to consider the nature and extent of the strictly professional labors rendered by this plaintiff in error plus all the rest of the members of the bar connected with the "glass casket crowd." It is quite true that the present indictment suddenly terminated the retainer of plaintiff in error or his firm, and it may be true that it is customary to collect from clients accused of crime large sums in advance of services rendered; but it remains true that the actual services of a legal nature rendered by the plaintiff in error to those accused of the casket fraud were perfunctory and trivial, and it was for the jury's consideration, under all the evidence, whether the moneys which unquestionably passed through the hands of Felder were or were not received for the purposes asserted by him, or expended in the manner by him alleged.

Without having reviewed all the evidence in this bulky record, we have sufficiently recorded the reasons for our conclusion, viz.: It was most fully proven that there was a conspiracy; also that the accused, including Felder, agreed to attempt the avoidance of indictment by the exercise of what is called "influence," and there was evidence quite sufficient to go to the jury on the vital point—i. e., did this plaintiff in error knowingly consent to share in the agreement to give, offer, or promise money to the officials described in the indictment? The jurors were entitled to answer that question of fact. Their answer is final.

Judgment affirmed.