416 F.2d 165
 UNITED STATES of America, Appellee,
v.
Benjamin SPOCK, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Michael FERBER, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Mitchell GOODMAN, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
William Sloane COFFIN, Jr., Defendant, Appellant.
 Nos. 7205-7208.
 United States Court of Appeals First Circuit.
 Heard Jan. 7, 1969.
Decided July 11, 1969.
 
 Leonard B. Boudin, New York City, with whom Victor Rabinowitz, New York City, Allan R. Rosenberg, Boston, Mass., David Rosenberg, Dorian Bowman, Diane B. Schulder, Rabinowitz, Boudin & Standard, New York City, and Putnam, Bell & Russell, Boston, Mass., were on brief, for Benjamin Spock, appellant.
 William P. Homans, Jr., Boston, Mass., with whom Raymond H. Young, Boston, Mass., was on brief, for Michael Ferber, appellant.
 Edward J. Barshak, Boston, Mass., with whom Bertram A. Sugarman, Sumner H. Rogers and Steven James Cohen, Boston, Mass., were on brief, for Mitchell Goodman, appellant.
 Arthur J. Goldberg, New York City, with whom Abraham Holdstein, New York City, James D. St. Clair, Wellesley Hills, Mass., Jay H. Topkis, Joseph H. Einstein and Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, were on brief, for William Sloane Coffin, Jr., appellant.
 Marshall Tamor Golding, Atty., Dept. of Justice, with whom Fred M. Vinson, Jr., Asst. Atty. Gen., Paul F. Markham, U.S. Atty., John Wall, Asst. U.S. Atty., and Joseph J. Cella, Jr., Sp. Asst. U.S. Atty., were on brief, for appellee.
 Frank B. Frederick, William B. Duffy, Jr., Henry P. Monaghan and Johnson, Clapp, Ives & King, Boston, Mass., on brief for Unitarian Universalist Ass'n, amicus curiae.
 Malcolm Monroe, New York City, on brief for National Committee for a SANE Nuclear Policy, amicus curiae.
 Arthur Kinoy, William M. Kunstler, New York City, Morton Stavis, Rita Murphy, Dennis J. Roberts, Harriet Van Tassel, Newark, N.J., Robert L. Boehm, New York City, and Lester S. Cramer, Boston, Mass., on brief for The Lawyers Committee on American Policy in Vietnam and The Law Center for Constitutional Rights, amici curiae.
 Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.
 ALDRICH, Chief Judge.
 
 
 1
 These are appeals by four defendants[1] convicted under a single count indictment for conspiracy. We reverse.
 
 
 2
 As is well known, the war in Vietnam and the draft to support it have engendered considerable animosity and frustration. In August 1967 a number of academic, clerical, and professional persons discussed the need of more vigorous opposition to governmental policies. From their eventually consolidated efforts came a document entitled 'A Call to Resist Illegitimate Authority' (hereinafter the Call) and a cover letter requesting signatures and support. The letter was signed by defendant Dr. Benjamin Spock and defendant Rev. William Sloane Coffin, Jr., and two other persons. The Call was originally signed by them, numerous others, and eventually by hundreds. The defendant Mitchell Goodman had been preparing a somewhat similar statement against the war and the draft. In mid-September he learned of the Call, which he also signed. He, Coffin, Spock and others spoke on October 2 at a press conference in New York City to launch the Call. It was there announced by Goodman that further activities were contemplated, including a nationwide collection of draft cards and a ceremonial surrender thereof to the Attorney General. On October 16 a draft card burning and turn-in took place at the Arlington Street Church in Boston, arranged by the defendant Michael Ferber, and participated in by Coffin. Four days afterwards all four defendants attended a demonstration in Washington, in the course of which an unsuccessful attempt was made to present the fruits of that collection and similar gatherings to the Attorney General.[2] The details of these matters will be discussed later.
 
 
 3
 The indictment was framed under section 12 of the Military Selective Service Act of 1967, 50 App. U.S.C. 462(a). It charged that defendants, and others known and unknown, conspired to 'counsel, aid and abet diverse Selective Service registrants to * * * neglect, fail, refuse and evade service in the armed forces of the United States and all other duties required of registrants under the Universal Military Training and Service Act * * * and the rules, regulations and directions duly made pursuant to said Act * * * to * * * fail and refuse to have in their personal possession at all times their registration certificates (and) * * * valid notices of classification[3] (and conspired to) * * * unlawfully, willfully and knowingly hinder and interfere, by any means, with the administration of the Universal Military Training and Service Act.'[4] The case was tried to a jury, which answered special questions framed by the court, most answers being unfavorable to the defendants, and returned general verdicts of guilty. On this appeal defendants raise a number of issues, the most basic of which is their asserted right to directed acquittals, either because of constitutional immunity or because the government failed in its proof. We consider these contentions in that order.
 
 
 4
 * Inseparable from the question of the sufficiency of the evidence to convict are the rights of the defendants, and others,[5] under the First Amendment. We approach the constitutional problem on the assumption, which we will later support, that the ultimate objective of defendants' alleged agreement, viz., the expression of opposition to the war and the draft, was legal, but that the means or intermediate objectives encompassed both legal and illegal activity without any clear indication, initially, as to who intended what. This intertwining of legal and illegal aspects, the public setting of the agreement and its political purposes, and the loose confederation of possibly innocent and possibly guilty participants raise the most serious First Amendment problems. Indeed our Brother Coffin, in dissent,[6] admits to a temptation 'to say that the law should recognize no overt conspiracy in the sensitive area of public opinion.' This temptation leads him down paths that we cannot follow, but which, nevertheless, we must consider.
 
 
 5
 As the defendants point out, most conspiracies are secret. To argue from this, however, that illegality presupposes secrecy is to confuse means with ends. Illegality normally seeks cover, but conspirators may act openly or not, as best suits their purpose. Here the defendants' primary object was publicity, and their conduct was designedly open. No one before has suggested that this fact, or the concomitant warning to the government of impending danger, requires that the government's hand be stayed until the substantive offense is committed.[7] Contrary to the defendants' position, many 'public' conspiracies have been successfully prosecuted. A case remarkably similar is Fraina v. United States, 2 Cir., 1918, 255 F. 28. There two defendants were charged with conspiring, together with persons unknown, to aid, abet and counsel divers unknown persons to evade and neglect the requirements of the then Selective Service Act. The overt acts alleged were the organizing of a mass meeting and the distribution of pamphlets entitled 'Conscientious Objectors' (who proved to be 'nonreligious conscientious objectors' whose 'idealism compels them to decline all forms of military service.') The opinion affirming the convictions touches many aspects of the case at bar in addition to the matter of publicity.[8]
 
 
 6
 That openness does not immunize an agreement may be demonstrated by an example. A group of vigilantes agreeing in the town square to solicit cohorts to call out a lynch mob would not be absolved because their agreement was open. Nor should their agreement be protected by the First Amendment if, at the same time, they were engaging in free speech on the evils of their victim's alleged offense; nor, indeed, because their principal object was the proper one of deterring such offenses. The dissent's finding the present agreement pasteurized because it was exposed to the light is in effect granting a right to public association which is not given free speech itself. Cox v. Louisiana, 1965, 379 U.S. 559, 563-564, 85 S.Ct. 476, 13 L.Ed.2d 487; Giboney v. Empire Storage & Ice Co., 1949, 336 U.S. 490, 501-502, 69 S.Ct. 684, 93 L.Ed. 834. Lack of arcana cannot be determinative.[9]
 
 
 7
 Admittedly, the First Amendment rights of free speech and free association, see, e.g., Elfbrandt v. Russell, 1966, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321; NAACP v. Alabama, 1958, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488, are of such importance that they must prevail if the government's interest in deterring substantive crimes before they take place[10] is insubstantial, or there is a 'less restrictive alternative' by which the substantive evil may be prevented. United States v. Robel, 1967, 389 U.S. 258, 265-268, 88 S.Ct. 419, 19 L.Ed.2d 508; Aptheker v. Secretary of State, 1964, 378 U.S. 500, 512-514, 84 S.Ct. 1659, 12 L.Ed.2d 992; Shelton v. Tucker, 1960, 364 U.S. 479, 488-489, 81 S.Ct. 247, 5 L.Ed.2d 231. This calls for a weighing. In Aptheker the Court struck down the broad Congressional proscription against issuing passports to Communists only after considering the availability and adequacy of other security measures, one actually proposed by the President. In defendants' much emphasized case of New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 279-283, 84 S.Ct. 710, 11 L.Ed.2d 686, not all public discussion was held protected; immunity was denied speakers motivated by 'actual malice.'
 
 
 8
 In comparing the present private and public interests we start with the assumption that the defendants were not to be prevented from vigorous criticism of the government's program merely because the natural consequences might be to interfere with it, or even to lead to unlawful action.[11] Thus Bond v. Floyd, 1966, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235, held that the First Amendment protected an expression of 'sympathy * * * and support (for) the men in this country who are unwilling to respond to a military draft.' The Court said, with specific reference to section 462(a), 'This statement alone cannot be interpreted as a call to unlawful refusal to be drafted.' Id. at 133, 87 S.Ct. at 348. The defendants here are not charged, however, with expressions of sympathy and moral support, but with conspiring to counsel, aid and abet Selective Service registrants to disobey various duties imposed by the Selective Service Act. The maintenance of an army in peacetime is a valid, in fact vital, governmental function. United States v. O'Brien, 1968, 391 U.S. 367, 377-378, 88 S.Ct. 1673, 20 L.Ed.2d 672. If a registrant may be convicted for violation of the draft laws, surely '(a) man may be punished for encouraging the commission of (the) crime.' Cox v. Louisiana, supra, at 563, 85 S.Ct. at 480; Fox v. Washington, 1915, 236 U.S. 273, 35 S.Ct. 383, 59 L.Ed. 573.
 
 
 9
 The government's ability to deter and punish those who increase the likelihood of crime by concerted action has long been established. See Developments in the Law-- Criminal Conspiracy, 72 Harv.L.Rev. 920, 923-25 (1959). Restricting it to punishment of substantive violations ignores the potency of conspiratorial conduct;[12] to wait for the substantive offense may be to wait too long. Congress has a right to prefer registrants to felons. However attractive the dissent's conclusion may be to those of liberal First Amendment views, it sets its own stage by asking 'whether there is reason or authority which compels the application (here) of the conspiracy sanction.' The authority is an act of Congress. We do not read the 'less restrictive alternative' cases as placing such a burden upon the government.[13]
 
 
 10
 Nor is the government's interest diminished in this case by defendants' claim that their conduct did not involve 'incitement' and their reliance upon Bond v. Floyd's pronouncement that an expression of 'sympathy and support' for those who resisted the draft did not violate section 462(a). The defendants do not quote all of Bond. The Court regarded Bond's first remarks as 'opaque.' Accordingly, it considered a second statement,[14] which it viewed as a 'clarification' demonstrating that Bond was not in fact 'advocating' a violation of law. It concluded that an expression of "sympathy * * * and support' * * * alone cannot be interpreted as a call to unlawful refusal.' The implication is apparent.
 
 
 11
 In the early Smith Act cases, in considering the defendants' conduct in teaching the doctrines of revolution and advocacy of violence, substantial questions arose as to imminency of accomplishment. Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Yates v. United States, 1957, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356. In the case at bar the defendants were concerned with the present. Their objective did not relate to some future war, but was a call for immediate action to thwart the one at hand. See Thomas v. Collins, 1945, 323 U.S. 516, 529-538, 65 S.Ct. 315, 89 L.Ed. 430. See also De Jonge v. Oregon, 1937, 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278. What is effective persuasion must depend on the circumstances.[15] The existence of a large number of young men, perhaps impressionable, and in any event oriented in defendants' direction by natural self-interest, adequately distinguishes this case from Wood v. Georgia, 1962, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569, and Bridges v. California, 1941, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192. In this context the 'soft sell' may be the most telling.[16]
 
 
 12
 Despite the validity of the government's present interest, the defendants were entitled under the cases to certain protections before they could be convicted of conspiracy in what we might call a bifarious undertaking, involving both legal and illegal conduct. This matter was considered by Mr. Justice Harlan, speaking for the Court in Scales v. United States, 1961, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782. The question there was whether convicting 'active' members of the Communist party would interfere with the freedom of inactive, or legal, members. In the course of discussing this question he spoke of such groups as not being a 'technical conspiracy' because of their mixed motives, and recognized the impropriety of a 'blanket prohibition of association with a group having both legal and illegal aims.' It did not follow, however, that distinction could not be effected. Indeed, this is the substantive purpose of all conspiracy law, which is directed only at those who have intentionally agreed to further the illegal object.[17] The First Amendment cases merely present a more difficult problem of insuring that the government does not use its procedural advantages to expand the strict elements of the offense.
 
 
 13
 In Scales the Court held that protection for the innocent could be adequately accomplished by requiring that the defendants' specific illegal intent be proved to the degree demanded in Noto v. United States, 1961, 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836. 'Criminal intent * * * must be judged strictissimi juris, for otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share.' Noto v. United States, at 299-300, 81 S.Ct. at 1522.[18] When the alleged agreement is both bifarious and political within the shadow of the First Amendment, we hold that an individual's specific intent to adhere to the illegal portions may be shown in one of three ways: by the individual defendant's prior or subsequent unambiguous statements; by the individual defendant's subsequent commission of the very illegal act contemplated by the agreement; or by the individual defendant's subsequent legal act if that act is 'clearly undertaken for the specific purpose of rendering effective the later illegal activity which is advocated.' Scales v. United States, 367 U.S. at 234, 81 S.Ct. at 1488.[19]
 
 
 14
 Application of such a standard should forcefully answer the defendants' protests that conviction of any of them would establish criminal responsibility of all of the many hundreds of persons who signed the Call. Even if the Call included illegal objectives, there is a wide gap between signing a document such as the Call and demonstrating one's personal attachment to illegality. Of greater importance, it responds to the legitimate apprehension of the amicus that the evil must be separable from the good without inhibiting legitimate association in an orderly society.
 
 
 15
 At the same time, this principle demonstrates a fundamental error in the government's approach. Adopting the panoply of rules applicable to a conspiracy having purely illegal purposes, the government introduced numerous statements of third parties alleged to be co-conspirators. This was improper. The specific intent of one defendant in a case such as this is not ascertained by reference to the conduct or statements of another even though he has knowledge thereof. Cf. United States v. Silverman, 2 Cir., 1957, 248 F.2d 671; Enfield v. United States, 8 Cir., 1919, 261 F. 141, 143-144. The metastatic rules of ordinary conspiracy are at direct variance with the principle of strictissimi juris.[20] We need not determine, however, to what extent, because of a failure to recognize this principle, there may have been prejudicial error requiring a new trial. For reasons that we will come to, (Point III, infra,) a new trial is required in any event. What we do determine is that the First Amendment does not, per se, require acquittal.
 
 II
 
 16
 In this section we consider whether, on the review of the record which is required by Yates v. United States, supra, and Dennis v. United States, supra, the evidence was sufficient to take the defendants to the jury. We divide this consideration into three parts. First, whether there was evidence of an agreement; second, whether the agreement contemplated or included illegal activity; third, whether the defendants individually adhered to that illegality.
 
 The Evidence of Agreement
 
 17
 The government's claim of agreement looks basically to the Call, the cover letter, and the subsequent press conference.[21] Spock participated in drafting the Call and, as has been stated, he and Coffin were two of the four persons who signed the cover letter. Goodman signed the Call, and was an active participant in the launching press conference which was chaired by Coffin and at which Spock appeared. Ferber did not sign the Call. The Call was addressed 'To the young men of America, to the whole of the American people, and to all men of good will everywhere.'[22] It observed there was a 'growing number of young American men' who, because of their moral and religious beliefs could not contribute to the war in Vietnam in any way. After setting forth at some length the signers' belief that the war was unconstitutional and illegal, it stated, 'We believe on all these grounds that every free man has a legal right and a moral duty to exert every effort to end this war, to avoid collusion with it, and to encourage others to do the same.' There followed a recital of the forms of resistance that young men were exercising, the detail of which we will return to, and an assertion of the signers' belief that 'each of these forms of resistance * * * is courageous and justified. * * * We will continue to lend our support to those who undertake resistance to this war. We will raise funds to organize draft resistance unions, to supply legal defense and bail, to support families and otherwise aid resistance to the war in whatever ways may seem appropriate. * * * We call upon all men of good will to join us in this confrontation with immoral authority. * * * Now is the time to resist.'
 
 
 18
 The cover letter, requesting signatures and other response to the Call, stated that the signers of the Call 'have pledged themselves to extend material and moral support to young men who are directly resisting the war.' There followed a 'box' containing requests for further signatures of 'endorsement,' contributions of '$ to support the work of RESIST. (Please make checks payable to RESIST.),' and volunteers interested in organizing or joining local groups 'to support young men directly resisting the war.' A similar 'box' appeared in the Call itself, when printed.
 
 
 19
 At the press conference, in addition to discussing the Call, Goodman advanced his own paper, signed also by Coffin, along strikingly similar lines, entitled 'Civil Disobedience Against the War' (hereinafter Civil Disobedience). It announced that the purpose of the signers was to 'take away from the government the support and bodies it needs' and contained the following:
 
 
 20
 'The draft law commands that we shall not aid, abet or counsel men to refuse the draft. But as a group of the clergy has recently said, * * * when young men refuse to allow their conscience to be violated by an unjust law and a criminal war, then it is necessary for their elders-- their teachers, ministers, friends-- to make clear their commitment, in conscience, to aid, abet and counsel them against conscription. Most of us have already done this privately. Now publicly we will demonstrate, side by side with these young men, our determination to continue to do so.'
 
 
 21
 Goodman described the Call as a first step, and said that further activity was to follow. He announced a demonstration to be held in Washington on October 20, as an act of 'direct creative resistance,' at which time draft cards surrendered at turn-ins that had been planned for October 16 would be delivered to the Attorney General. This announcement, as both conceded, was the result of a prearrangement with Coffin.
 
 
 22
 Spock argues that there was no 'agreement among leaders of an integrated political group * * *. This case presents no more than the publicly expressed coincidence of views on public affairs.' No merit, however, lies in the suggestion that there must be a cohesiveness in the group beyond the confines of the agreement itself. See Direct Sales Co. v. United States, supra n. 7, at 713, 63 S.Ct. 1265; cf. United States v. Falcone, 1940, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128.[23] In the light of all the circumstances the jury was not obliged, in considering the question of agreement, to find a mere coincidence in the appearance of several speakers on the same platform. See Fraina v. United States, supra. Cf. United States v. Kompinski, 2 Cir., 1967, 373 F.2d 429, 434.[24]
 
 
 23
 The Call was not what is known in law as an integrated document, limited to the four corners of the instrument. The jury could properly infer that it could not occur in the abstract, with no parents, and no active participants in a joint undertaking. We hold that they could look to Spock as one of the drafters, and to Spock and Coffin as two of the four signers of the solicitation letter, and in the light of the press conference held to publicize the Call in which Goodman took a prominent part, they could find that Goodman included himself as an active member. The evidence disclosed more than parallel conduct, see United States v. Bufalino, 2 Cir., 1960, 285 F.2d 408, 414-415; rather there are several instances of concerted activity from which the jury could infer an agreement.[25] Whether the defendants' intended participation was unlawful is another matter.
 
 The Evidence of Illegal Purpose
 
 24
 The defendants contend that nothing in the record would justify a finding of unlawful purpose in their agreement. Spock puts this succinctly: 'There is nothing in the Call to Resist * * * which suggests the objective of counseling, aiding and abetting anyone to resist induction.' Rather, he contends the only action contemplated was 'simply moral support and financial aid for young men and their families who in good conscience are unable to participate in the war.' Coffin argues further, 'Draft 'resistance' is not a crime; the statute forbids only 'evasion' and 'refusal."
 
 
 25
 Examination of the Call shows nothing suggesting it sought to distinguish between 'resistance' and 'refusal.' It was addressed to laymen, and is to be given a common sense and not a legalistic interpretation. We look, as indeed with any document, to its own clues as to what its subscribers may have intended the words to mean. So doing, we believe a jury would be amply justified in finding that 'resist' included that type of resistance which the signers recognized, to use the words of Bond v. Floyd, supra, as 'a call to unlawful refusal.' Hence the whole concept of 'illegitimate' authority. 'Refusing to be inducted' must imply an order of induction to be refused. Hence the 'heavy penalty' for 'resisting openly.' Hence the 'need to support families,' since families would not need support if the registrants' conduct met legal standards. 'Sanctuary in other countries' scarcely suggests travel authorized by the registrant's draft board.[26]
 
 
 26
 Nor was this a mere factual recital of what others were doing. 'Now is the time to resist.' It was at least open to the jury to find that these illicit actions were within what the Call, to use its own word, sought to 'encourage;' and that the Call was, to repeat, in the words of the Court in Bond, 'a call to unlawful refusal to be drafted.'
 
 
 27
 This is not to deny that the Call contained many lawful criticisms of the war, lawful adjurations and expressions of sympathy and support for persons who acted illegally, and contemplated conduct of an entirely lawful character. It is also true, as Spock points out, that the Call stated that funds would be used 'in whatever ways may seem appropriate.' From this he argues that the persons signing the Call 'reserve to themselves the determination of 'what ways may seem appropriate." While this may be so, nonetheless the Call on its face indicated that some signers considered the illegal to be the appropriate. Cf. Truax v. Corrigan, 1921, 257 U.S. 312, 327-328, 42 S.Ct. 124, 66 L.Ed. 254. We adopt the description given in the perceptive brief of the Unitarian Universalist Association, amicus on behalf of Ferber. The Call had 'a double aspect: in part it was a denunciation of governmental policy and, in part, it involved a public call to resist the duties imposed by the Act.'
 
 The Evidence of Specific Intent
 
 28
 There remains the question whether it could have been found, within the strict test laid down by the cases supra, that the individual defendants personally agreed to employ the illegal means contemplated by the agreement including counselling unlawful refusal to be drafted or other violations of the Selective Service Act. We will begin with Goodman and his affirmative statement regarding counselling contained in 'Civil Disobedience,' written by him and signed by Coffin, quoted supra. In describing this paper, Coffin argues, as he did with the Call, that it 'cannot be interpreted as a call to unlawful refusal to be drafted.' 'One may counsel against conscription by urging the claiming of exemption or deferment * * *. Only counselling of evasion or refusal is unlawful, not counselling of avoidance. Avoidance may be entirely lawful-- as by claiming lawful exemption or deferment.' This appraisal seems divorced from the realities. No defendant either here or at any time, used the word 'avoidance.' There is not even a reference in Civil Disobedience to 'exemption or deferment,' except for an expression of approval of those who voluntarily waive such. Nor does anyone explain the reference to long jail sentences, if 'refusing * * * to serve when called' means lawful refusal.[27]
 
 
 29
 In addition, Goodman's remarks at the Washington demonstration were pari passu. There, after referring to the continuing activities of the Resistance in their successful solicitation of 'draft resisters,' Goodman stated that those of the older generation were present 'because we want specifically to form an alliance with these young men which we will persist in, at least as long as the war lasts, in which we will encourage them and aid and abet and counsel them in every way we know how.' The ambiguity in the original agreement was clarified, as to Goodman, by his own statements. Because a properly instructed jury could have found Goodman had the requisite specific intent he was not entitled to an acquittal.[28]
 
 
 30
 Coffin also signed Civil Disobedience, but if it could be thought that in some manner he is not to be personally charged therewith we quote his remarks at Washington, when it was sought to present turned-in cards to the Attorney General, again, like Goodman, speaking in terms of a joint undertaking.
 
 
 31
 'The law of the land is clear. Section 12 of the National Selective Service Act declares that anyone 'who knowingly counsels, aids, or abets another to refuse or evade registration or service in the armed forces * * * shall be liable to imprisonment for not more than five years or a fine of ten thousand dollars or both.'
 
 
 32
 'We hereby publicly counsel these young men to continue in their refusal to serve in the armed forces as long as the war in Vietnam continues, and we pledge ourselves to aid and abet them in all the ways we can. This means that if they are now arrested for failing to comply with a law that violates their consciences, we too must be arrested, for in the sight of that law we are now as guilty as they.
 
 
 33
 'It is a longstanding tradition, sanctioned by American democracy, that the dictates of government must be tested on the anvil of individual conscience. This is what we now undertake to do-- not as a first but as a last resort. And in accepting the legal punishment we are, in fact, supporting, not subverting, the legal order.
 
 
 34
 'Still, to stand in this fashion against the law and before our fellow Americans is a difficult and even fearful thing. But in the face of what to us is insane and inhuman we can fall neither silent nor servile. Nor can we educate young men to be conscientious only to desert them in their hour of conscience. So we are resolved, as they are resolved, to speak out clearly and to pay up personally.'[29]
 
 
 35
 Finally, at the Arlington Street Church ceremony on October 16 Coffin not only spoke but assisted in the collection of draft cards. This participation and assistance could well have been found to be aiding and abetting non-possession.[30] Because it was this very type of resistance that the agreement might have been found to contemplate, a properly instructed jury could find that Coffin had the requisite specific intent. The jury was not obliged to view his conduct as he would have it on appeal. Before us he argues, 'It is no crime * * * to agree to deliver turned-in draft cards to the Attorney General * * *. This action was completely law-abiding-- Rev. Coffin accurately viewed it as the delivery to the law of evidence of a crime.' We do not think of Coffin as one to run with the hare and hold with the hounds. In any event, he was not entitled to an acquittal.
 
 
 36
 The principle of strictissimi juris requires the acquittal of Spock. It is true that he was one of the drafters of the Call, but this does not evidence the necessary intent to adhere to its illegal aspects. Nor does his admission to a government agent that he was willing to do 'anything' asked to further opposition to the war. Specific intent is not established by such a generalization. Whatever the reason[31] the fact is that his speech was limited to condemnation of the war and the draft, and lacked any words or content of counselling. The jury could not find proscribed advocacy from the mere fact, which he freely admitted, that he hoped the frequent stating of his views might give young men 'courage to take active steps in draft resistance.' This is a natural consequence of vigorous speech.
 
 
 37
 Similarly, Spock's actions lacked the clear character necessary to imply specific intent under the First Amendment standard. He was not at the Arlington Street Church meeting; in fact he knew nothing of it until afterwards. Although he was at the Washington demonstration he had, unlike Goodman and Coffin, no part in its planning. He contributed nothing, even by his presence, to the turning in of cards. Nor, finally, did his statements in the course of the Washington demonstration extend at all beyond the general anti-war, anti-draft remarks he had made before. His attendance is as consistent with a desire to repeat this speech as it is to aid a violation of the act.
 
 
 38
 The dissent would fault us for drawing such distinctions, but it forgets the teaching of Bond v. Floyd and other cases that expressing one's views in broad areas is not foreclosed by knowledge of the consequences, and the important lesson of Noto, Scales and Yates that one may belong to a group, knowing of its illegal aspects, and still not be found to adhere thereto. Viewing the record as a whole we feel we would be doing poor service to the rule of strictissimi juris, and to the principle that there must be substantial evidence, Yoffe v. United States, 1 Cir., 1946, 153 F.2d 570, and not a mere scintilla, Magnat Corp. v. B & B Electroplating Co., 1 Cir., 1966, 358 F.2d 794, to warrant submitting a case to the jury if we failed to hold Spock entitled to an acquittal.[32] Cf. Hellman v. United States, 9 Cir., 1961,298 F.2d 810.[33]
 
 
 39
 The defendant Michael Ferber presents a different situation. Ferber was a draft-age student. His activities were limited to assisting in the burning and surrender of draft cards. Although he made an address at the Arlington Street Church, it was not counselling draft resistance, or even the surrendering of cards. Not only did he not sign the Call, or the cover letter, or attend the press conference, but the evidence did not warrant a finding that through other statements or conduct he joined the larger conspiracy for which the other defendants were prosecuted. The fact that he made incidental use of the services of some of the other defendants for his own purposes does not mean that he evidenced an attachment to all of theirs. It may be that Ferber engaged in a smaller conspiracy. This does not mean that he should be convicted for the larger one. Daily v. United States, 9 Cir., 1960, 282 F.2d 818. He must be acquitted.[34]
 
 III
 
 40
 As already stated, we have not fully pursued the question of prejudicial error in the course of trial because, in the exercise of our supervisory power,[35] we feel obliged to consider another question, the answer to which occasions no doubt. The district court, sua sponte, put to the jury, in addition to the general issue of guilty or not guilty, ten special questions to be answered 'Yes' or 'No.' The first was as follows.
 
 
 41
 'Question No. 1. Does the Jury find beyond a reasonable doubt that defendants unlawfully, knowingly and wilfully conspired to counsel Selective Service registrants to knowingly and wilfully refuse and evade service in the armed forces of the United States in violation of Section 12 of the Military Selective Service Act of 1967?'
 
 
 42
 The second substituted for the word 'counsel' the word 'aid,' and the third substituted the word 'abet.' The questions then dealt separately, but identically, with 'notices of classification' and 'registration certificates.'[36] The final question related to a conspiracy 'to hinder or interfere with the administration' of the draft law. These questions were phrased without consultation with the defendants, and were objected to as to form-- notably, that they linked all defendants together. In view of the fact that this did not prevent the jury from finding one defendant not guilty, we do not pause over such criticism. Nor do we consider the difficulty a jury might have in distinguishing between counselling and aiding, and between aiding and abetting. The ultimate, basic complaint is to the submission of special questions at all, a matter vigorously protested by the defendants at the trial, and here.
 
 
 43
 The submission of questions to the jury in civil cases is an everyday occurrence. In criminal cases, outside of a special, narrow area, the government is not only without precedent, but faces a formidable array of objections. The simplest is that the Federal Rules of Criminal Procedure contain no provision complementing F.R.Civ.P. 49 covering the civil practice. Indeed, as emphasizing this difference, we note that F.R.Crim.P. 23(c) provides for special findings by the judge. While the absence of a rule is not necessarily determinative, particularly in the light of F.R.Crim.P. 57(b),[37] it is highly suggestive. See Stein v. New York, 1953, 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522; Gray v. United States, 8 Cir., 1949, 174 F.2d 919, 923-924, cert. denied 338 U.S. 848, 70 S.Ct. 90, 94 L.Ed. 519.
 
 
 44
 Of more substantive importance is the fundamental difference in the jury's functions in civil and criminal cases. In civil trials the judge, if the evidence is sufficiently one-sided, may direct the jury to find against the defendant even though the plaintiff entered the case bearing the burden of proof. F.R.Civ.P. 50. In a criminal case a court may not order the jury to return a verdict of guilty, no matter how overwhelming the evidence of guilt.[38] This principle is so well established that its basis is not normally a matter of discussion. There is, however, a deep undercurrent of reasons. Put simply, the right to be tried by a jury of one's peers finally exacted from the king would be meaningless if the king's judges could call the turn.[39] Bushel's Case, 124 Eng.Rep. 1006 (C.P.1670). In the exercise of its functions not only must the jury be free from direct control in its verdict, but it must be free from judicial pressure, both contemporaneous and subsequent. Commonwealth v. Anthes, 1857, 71 Mass. (5 Gray) 185, 209-10; Rex v. Larkin, (1943) K.B. 174; P. Devlin, Trial by Jury 14, 56, 75-91 (3d impr. with addendum, 1966); T. Plucknett, A Concise History of the Common Law 137-38 (5th ed. 1956); Howe, Juries as Judges of Criminal Law, 52 Harv.L.Rev. 582 (1939). Both have been said to result from the submission of special questions.
 
 
 45
 'It is one of the most essential features of the right of trial by jury that no jury should be compelled to find any but a general verdict in criminal cases, and the removal of this safeguard would violate its design and destroy its spirit.'
 
 
 46
 G. Clementson, Special Verdicts and Special Findings by Juries, 49 (1905).
 
 
 47
 'The submission of special interrogatories, answers to which are to accompany the general verdict * * *. (began as an effort) to catechize a jury as to its reasons * * *.'
 
 
 48
 Morgan, A Brief History of Special Verdicts and Special Interrogatories, 32 Yale L.J. 575, 592 (1923). See also Walker, The Finality of Jury Verdicts, 118 New L.J. 866, 867-68 (1968). This merges into a more basic reason which the court noted but, because of special circumstances, did not accept, in United States v. Ogull, S.D.N.Y., 1957, 149 F.Supp. 272, 276, affirmed without discussion of this point, sub nom. United States v. Gernie, 2 Cir., 1958, 252 F.2d 664, cert. denied, 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073,
 
 
 49
 'To ask the jury special questions might be said to infringe on its power to deliberate free from legal fetters; on its power to arrive at a general verdict without having to support it by reasons or by a report of its deliberations; and on its power to follow or not to follow the instructions of the court. Moreover, any abridgement or modification of this institution would partly restrict its historic function, that of tempering rules of law by common sense brought to bear upon the facts of a specific case.'
 
 
 50
 The cogency of this is so felt by Mr. Justice Black and Mr. Justice Douglas that they disapprove of special interrogatories even in civil cases.[40]
 
 
 51
 We are less concerned by the jury's possible fear of subsequent criticism with respect to special findings than we are with the subtle, and perhaps open, direct effect that answering special questions may have upon the jury's ultimate conclusion. There is no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step. A juror, wishing to acquit, may be formally catechized. By a progression of questions each of which seems to require an answer unfavorable to the defendant, a reluctant juror may be led to vote for a conviction which, in the large, he would have resisted. The result may be accomplished by a majority of the jury, but the course has been initiated by the judge, and directed by him through the frame of the questions.
 
 
 52
 It may be said that since the law should be logical and consistent, if the questions were proper in substance this would be a desirable rather than an undesirable result. We agree, however, with the distinction made by L. Hand, J., concurring in Skidmore v. Baltimore & O. Ry., 2 Cir., 1948, 167 F.2d 54, 70, cert. denied, 335 U.S. 816, 69 S.Ct. 34, 93 L.Ed. 371, when speaking in favor of special verdicts in civil cases.
 
 
 53
 'I should like to subject a verdict, as narrowly as was practical, to a review which should make it in fact, what we very elaborately pretend that it should be: a decision based upon law. In criminal prosecutions there may be, and in my judgment there are, other considerations which intervene to make such an attempt undesirable.'
 
 
 54
 Uppermost of these considerations is the principle that the jury, as the conscience of the community, must be permitted to look at more than logic. Indeed, this is the principle upon which we began our discussion. If it were otherwise there would be no more reason why a verdict should not be directed against a defendant in a criminal case than in a civil one. The constitutional guarantees of due process and trial by jury require that a criminal defendant be afforded the full protection of a jury unfettered, directly or indirectly. See Morris v. United States, 9 Cir., 1946, 156 F.2d 525.
 
 
 55
 In this circumstance, the government makes two answers. The first is that in a small number of criminal cases special findings have been permitted. No useful purpose would be served by discussing these cases; they are distinguishable.[41] In all, because of the exigencies of the particular case, the special findings had the purpose of benefiting the defendant. In none did the defendants object.41A It is elementary that a defendant, properly advised, may waive even fundamental rights. See Killilea v. United States, 1 Cir., 1961, 287 F.2d 212, 215-216, cert. denied, 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed.2d 1259. No such special circumstances existed in the case at bar, nor did the defendants think so.
 
 
 56
 Nor is it an answer that these questions were labelled special findings and not special verdicts, and that the jury was informed that they were to be answered only if a general verdict of guilty had been reached. It cannot be assumed that a jury would scrupulously adhere to such chronology even if, as the government contends, the charge as a whole could be taken as instructing the jury that this was the proper order of procedure. Rather, it would have been natural, in case the jury found itself in doubt, to do the reverse. Particularly would this be so when the court's last remark on this subject was, 'These special questions, members of the jury, will help to inform you as to the issues involved in this case.' The jury could well take this as an invitation, not a proscription.
 
 
 57
 We are not necessarily opposed to new procedures just because they are new, but they should be adopted with great hesitation. Cf. Gray v. United States, supra, at 924 ('It is not the function of the courts subordinate to the Supreme Court to introduce innovations of criminal procedure.'). It takes but little imagination to see that the present case should be the last, rather than the first, to embark upon a practice of submitting special jury findings in a criminal case along with the general issue for no significant reason.[42] Here, whereas, as we have pointed out, some defendants could be found to have exceeded the bounds of free speech, the issue was peculiarly one to which a community standard or conscience was, in the jury's discretion, to be applied. Cf. Wigmore, A Program for the Trial of Jury Trial, 12 Am.Jud.Soc.J. 166, 170-71 (1929). Whether we agree with defendants' position or not, this was not a case to be subjected to special limitations not sanctioned by general practice. We must hold the court's action to be prejudicial error.
 
 
 58
 The verdicts are set aside, and the judgments vacated. Judgments are to be entered for the defendants Spock and Ferber, and a new trial is ordered for the defendants Goodman and Coffin.
 
 
 59
 COFFIN, Circuit Judge (dissenting in part).
 
 
 60
 I concur in that part of the court's opinion dealing with the submission of special questions to the jury. However, I would grant acquittals to all appellants, since, in my view, whatever substantive crimes of aiding, abetting, and counselling, or whatever more specific conspiracies may have been committed, the crime of conspiracy, as charged in the indictment, was not. To apply conspiracy doctrine to these cases is, in my view, not compelled by conspiracy precedents, not consistent with First Amendment principles, not required to deal effectively with the hazard to public security, and not capable of discriminating application as between the culpable and the innocent.
 
 
 61
 A comparison of the structures of the court's and of this separate opinion reveals much concerning our differences. The court begins by asking whether there is any reason or authority barring prosecutions for public conspiracy in the speech-opinion field; I begin by asking whether there is reason or authority which compels the application of the conspiracy sanction to the kind of organization, activity, and purposes involved in these cases. The court next identifies the valid public interest in timely self-protection and then addresses the various tests required to safeguard individual rights. I reverse the order at this point, seeking first to identify the hazards to individual freedom of expression and association, then addressing the question whether society can adequately protect its security in less constraining ways. Finally, the court finds, in weighing the evidence, that its guidelines are useful in distinguishing between the culpable conspirator and the protected advocate; I fail to see either the practicable utility of the tests or any basis for treating some of these appellants differently from others.
 
 
 62
 My starting point is the inquiry: how far has the application of conspiracy doctrine reached into the arena of overt associations involving the expression of opinion on public issues? Do reason and authority compel its application to a wholly open, amorphous, and shifting association, having a broad focus of interest in changing public policy, and encompassing a wide spectrum of purposes, legal and illegal?
 
 
 63
 Historically, the doctrine of conspiracy was concerned with only a secret enterprise. Indeed, the word conspiracy devolves from the Latin 'conspirare' meaning 'to breathe together'. If a group, having illegal designs, desired to achieve its ends through surprise, thus depriving society of open confrontation, assessment, and preparation, it was both fair and necessary to give society the means to deal with it effectively, i.e., the ability to prosecute individuals who may never commit a substantive offense or never be caught in committing one, but whose responsibility for and participation in the enterprise are established. Effective response also meant the ability of the state to act in timely fashion-- to forestall a serious threat to its safety and welfare before a debacle occurred. Finally, the core idea underlying the conspiracy theory is that disciplined, concerted action poses a greater threat to society than does individual or uncoordinated group effort in that larger numbers permit a division of labor, and discipline makes withdrawal from the enterprise less likely.[1]
 
 
 64
 This reasoning applied to the early plotters against the King; to subversive movements such as the Communist Party; to classical criminal undertakings such as bank robberies, bribery, and murder; and to certain antitrust violations. Particularly in the latter case was it both reasonable and necessary to give society another instrument-- that of using parallel performances as evidence of an underlying illegal agreement.
 
 
 65
 In the case of public 'conspiracies' in the field of opinion, however, the historic rationale for prosecuting the instigators of a group effort loses much of its force. The fact that the group initially places itself at the mercy of the public marketplace of ideas, risking disapproval, recommends that it have the protection of the First Amendment in its effort to gain approval. That a public 'agreement' has been arrived at is not so much the genesis of the undertaking or a key to identifying masterminds as it is the manifestation of common concern. There is no possibility of taking society by surprise. There is no difficulty in ascertaining the activists who bear watching.
 
 
 66
 One is tempted to say that the law should recognize no overt conspiracy in the sensitive area of public discussion and opinion. But this would be to go too far.[2] Were this so, 'going public' would confer an immunity both on nefarious joint undertakings and an absolute protection to criminal enterprise not vouchsafed by the First Amendment even for individual speech.
 
 
 67
 Do the cases indicate where the line should be drawn? Of course, closely-knit groups directed at the execution of orthodox criminal enterprises are clearly punishable as conspiracies. See, e.g., Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943); United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Although there are not many conspiracy cases in the field of opinion, I think it is possible to locate the outer limits of the reach of the conspiracy weapon. The cases closest to the traditional criminal conspiracy are those in which a disciplined, cohesive organization-- perhaps more covert than overt-- devotes itself with singleness of mind to one illegal purpose.[3] Then there are cases where a disciplined organization strives to accomplish a number of purposes, some legal and some illegal.[4] In both types of cases the conspiracy cannot really be said to be open; and in both the combination is bound together by strict partylike discipline.
 
 
 68
 Moving along the spectrum to associations which are at once more adventitious and amorphous in structure and wholly overt in their functioning, we find little authority. When such a combination has as its objective a specific enterprise devoted to a single illegal purpose, it is possible to concede that a culpable conspiracy has been formed. The planning and execution of the Arlington Street Church draft card turn-in might have been such a conspiracy, assuming that the timing, publicity, and foreseeable impact provided a sufficient basis for finding a high probability of substantial harm. In such a case the participants would have been a discrete group; the objective of the affair would have been illegal (abetting turn-ins); and it might well be that one who planned but did not participate (and thus did not commit a substantive offense of aiding or abetting or counselling) would be indictable as a conspirator.
 
 
 69
 Such is the hypothetical case put by the court of a lynching-bent group of vigilantes. Openness of course could not pasteurize the illegality of purpose. The example, however, suffers in the limited and subordinate extent to which speech is involved. More apposite to the sharply defined open conspiracy in the free speech area is Fraina v. United States, 255 F. 28 (2d Cir. 1918). The factual situation is close to that which would have been presented by a conspiracy indictment against those responsible for the Arlington Church affair. Even this authority for this narrow proposition is less than robust.[5] And we have found no other.
 
 
 70
 But we face here something quite different from an indictment for an overt promotion of a specific event for an overriding illegal purpose. Here we confront a 'conspiracy' where (1) the effort was completely public; (2) the issues were all in the public domain; (3) the group was ill-defined, shifting, with many affiliations; (4) the purposes in the 'agreement' are both legal and illegal; and (5) the need for additional evidence to inculpate-- notwithstanding the absence of a statutory requirement for an overt act-- is recognized.
 
 
 71
 There is no legal precedent for applying the conspiracy theory to such an effort. This is, to my knowledge, the first attempt to use conspiracy as a prosecutorial device in such circumstances. The attempt to distill the several individual lessons taught by prior cases, mostly old, and combine them in such a case as this is not to apply precedents but to extend them. I would not-- for the first time-- grant this weapon to the government in this kind of case without the alternative assurance that hazards to individual rights would not be increased or that the interest in the nation's well-being and security cannot be as well served in less repressive ways.[6] So viewing conspiracy law, I ask whether there are hazards to free expression of opinion in extending conspiracy to the cases at bar. The court has attempted to be scrupulously fair and sensitive to the possibility of abuse of the conspiracy weapon. It carefully rejects the use of 'the Call' to jeopardize its signers without the proof of specific intent. And equally carefully it delimits the ways in which specific intent can be established: (1) proof of prior or subsequent unambiguous statements; (2) proof of commission of illegal acts; (3) proof of subsequent legal acts clearly undertaken for rendering effective the advocated illegal action.
 
 
 72
 By so proceeding, the court goes far to depriving the 'agreement' of significance. Indeed, it upholds the indictment as to only one of the original four signers of the 'Call' and acquits another original signer.[7] But the evil is that such a document is pregnant with any significance at all.
 
 
 73
 What are the implications of the three methods of activating one's signature to the 'Call' to status as a full-fledged conspirator? To say that prior or subsequent unambiguous statements change the color of the litmus is to say that while one exercise of First Amendment rights is protected, two are not.[8] To say that actual commission of illegal acts (i.e., encouraging turning in or burning draft cards-- not specifically described in the 'Call') renders culpable the more opaque original 'agreement' is to say simply that the subsequent commission of one crime becomes suddenly the commission of two crimes. To say that 'subsequent legal acts clearly undertaken for rendering effective the advocated illegal action' renders retrospectively conspiratorial the earlier protected ambiguous advocacy is to say that two rights make a wrong. For example, were the janitor of Arlington Church to have signed the 'Call' and subsequently to have volunteered his services to tidy the pews for the turn-in, he would have metamorphosed into a conspirator.
 
 
 74
 I cannot believe that this delayed fuse approach to determining the conspiratorial culpability of signing a document like the 'Call' would have anything other than a pronounced chilling effect-- indeed that of a sub-zero blast-- on all kinds of efforts to sway public opinion. For example, such diverse groups as Clergy Concerned, a consumers' boycott of California grapes, a parents' group for so-called 'freedom of choice' plans within a southern school district might find themselves facing a conspiracy indictment. Even if the court's safeguards were rigorously applied, the ranks of individuals enlisted in a controversial public cause would visibly shrink if they knew that the jury could find them to be members of a conspiracy on the basis of either their subsequent statements or legal acts.
 
 
 75
 In footnote 12 of the opinion the court recognizes that judicial hostility to conspiracy prosecutions has been occasioned by the government's overenthusiastic use of the doctrine. That fact coupled with the absence of clear definitions of the elements of conspiracy creates a serious risk. I see no reason to inject that risk into the area of public discussion. Its chilling effect is obvious. It would be small comfort to be told that one could still be vindicated via the appellate process after an expenditure of time and money in substantial amounts.
 
 
 76
 There is also, in my view, a defect in the government's case arising from elements of both overbreadth and vagueness. Not, perhaps in the traditional sense of overbreadth of a statute. But in the sense of overbreadth in the indictment. Although the matter is not entirely free from doubt, it may be, as the court suggests in footnote 21 of its opinion that 462(a) is not overbroad or vague. But when the conspiracy doctrine is superimposed on 462(a), and especially in this case, grave problems are presented.
 
 
 77
 In Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966), the Supreme Court struck down the Kentucky common law crime of libel on grounds of overbreadth due to vagueness. In so doing, the court referred, at 384 U.S. 200, n. 1, to Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926), containing its long-standing caveat that criminal laws must not forbid '* * * the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application * * *.' 269 U.S. at 391, 46 S.Ct. at 127.
 
 
 78
 Conspiracy is an ancient doctrine. It is, however, not well-defined and experience teaches that even its traditional limitations tend to disappear. See Developments in the Law, Criminal Conspiracy, 72 Harv.L.Rev. 920, 933-34 (1959). In the present case the absence of definition is perhaps best illustrated by comparing the original indictment with the government's subsequent shift in position in conceding that there were also perhaps several smaller conspiracies. And in addition to the government's theories, the court takes yet a third view.[9] This case, it seems to me, is a proper case for applying the Supreme Court's mandate that an overly-broad prosecution cannot be saved on appeal by a limiting construction. See, Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Shuttlesworth v. Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965); Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969).[10] The objection to an overly broad indictment is the same as that to an overly broad statute. In both cases the defendants are tried under one theory and their convictions can be upheld only under an entirely different theory.
 
 
 79
 To summarize, the hazards to free speech from the sequential open-endedness of the specific intent formulas and the lateral open-endedness of overbreadth and vagueness are not lightly to be tolerated. We should be slow to grant grudgingly today what may become license tomorrow. This leads to the question whether the danger to society justifies such circumscribing of First Amendment rights.
 
 
 80
 In addressing this question, both the court and I make reciprocal concessions. I concede that there is a need to maintain a peace time army, that a registrant may be convicted for violation of the draft laws, that one may be punished for encouraging such violation, that there exists a danger of widespread disaffection and resistance to the draft laws, and that the government is entitled to take all reasonable steps to protect itself before such disaffection becomes epidemic. The court concedes that speech need not be forbidden because it bears a causal relation to ultimate unlawful acts, and that the First Amendment rights of free speech and association are to prevail unless the government's interest in preventing substantive crimes is substantial or unless there is a 'less restrictive alternative' to deal with the problem, citing United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); and Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). It concedes that this principle calls for a weighing.
 
 
 81
 Here we part company, for the court attends only to one side of the balance. Into that scale it puts four weights: (1) the nation's interest in raising an army; (2) the right of government, in view of 'the potency of conspiratorial conduct', not to await the commission of substantive offenses; (3) the effectiveness as 'incitement' of appellants' call for immediate action on a large number of sympathetic young men; and (4) the fact that Congress has authorized the conspiracy sanction.
 
 
 82
 Congressional authorization of the conspiracy sanction cannot, in my view, weigh heavily on the scales once a genuine issue is raised as to the availability of a less restrictive alternative. When, however, such a threat appears substantial, courts must ask if there are other approaches which 'more precisely and narrowly' serve the same governmental interest. See United States v. O'Brien, 391 U.S. 367, 381, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The fact that Congress has prescribed one approach presents the occasion for weighing; it cannot additionally predetermine the result, or the less restrictive alternative doctrine, as applied, for example, in Robel and Aptheker would have no meaning.
 
 
 83
 Indeed, the question here is not really one of Congress' authority. In 462(a) Congress has provided for the use of the conspiracy sanction, and I do not quarrel with its application in a proper case. All that can be drawn from the statute is that Congress authorized the use of conspiracy where appropriate to protect the nation's interest in raising an army. If it could be imagined that Congress intended to apply conspiracy to the facts of this case, my answer is that the First Amendment denies it the power to do so.[11]
 
 
 84
 The unexplored question is whether these interests can be as well served without resort to the conspiracy weapon. Here the 'agreement' itself was an insufficient predicate. Something more was required. Neither Coffin nor Goodman, under the court's rationale, became culpable until he made a statement or executed an act which constituted the substantive offense of aiding, abetting, or counselling draft evasion.
 
 
 85
 Had the appellants individually or collectively been indicted or tried for their separate offenses, the task would have been much simpler, as a reading of the transcript convincingly illustrates. The government would not have been delayed in time. It could have chosen whoever seemed most significant for psychological impact. Its proof against each would have been narrowly confined. It would not have faced the difficulties of special instructions on the occasion of the admission of evidence and on the occasion of the charge. I observe also that the penalty for conspiracy under 462(a) is not greater than that for the substantive offenses. Moreover, the government could have chosen a specific incident for the focus of a conspiracy-- as, for an arguable example, the Arlington Church turnin or the Department of Justice card collection ceremony.
 
 
 86
 Nowhere does the court indicate why either approach could not have served the societal interest equally well. If 'less restrictive alternative' is to have any real meaning, courts should examine with specificity the utility of the rifle before resort is had to the shotgun.
 
 
 87
 In short, the court's lack of emphasis on the 'agreement' element results in its applying a form of substantive offense prosecution. The difference is-- and it is a critical one-- that a defendant may be punished not only for illegal acts but also on the basis of protected speech and legal acts. I conclude that prosecution for substantive offenses or for a narrow, discrete conspiracy, would fully serve the government's interest-- perhaps even more than the court's sweeping conspiracy theory-- without delivering such a serious blow to First Amendment freedoms.
 
 
 88
 To the extent that the court's acquittal of the defendants Spock and Ferber is thought to illustrate the discriminating capacity of its rationale to separate the sheep from the goats, I respectfully take issue. In my view the acquittals are not justified by the court's own guidelines.
 
 
 89
 The court acquits the defendant Spock, a man of great public visibility,[12] who signed the 'Call', appeared at the press conference, and was present at Washington when the harvest of card turn-ins was presented to the Attorney General. For reasons which are unclear, the court, so restrained in permitting the jury to pass on other issues, chose to take the question of Spock's guilt away from them.
 
 
 90
 On the basis of the testimony of both Spock and FBI agents who interviewed him, the jury could have found that Spock worked with several organizations supporting 'draft resistance', that he undertook his activities so that others would be encouraged to resist, and that his participation in the Whitehall demonstration was intended 'to interfere with the administration of the Selective Service Act' and to frustrate the raising of troops.[13] In addition the agent testified that Spock stated that had his actions at Whitehall '* * * led to young men's refusing to be drafted, that would have suited my purposes.'
 
 
 91
 Even assuming that Spock did not commit any illegal acts, there is no reason why the jury could not find his attendance at Washington on October 20 and his involvement at Whitehall to be legal acts clearly undertaken to advance the illegal aims of the conspiracy. Indeed, in view of the remarks attributed to Spock, the jury would clearly have been justified in so finding.
 
 
 92
 I am of course mindful of the lesson of Scales, supra, and Noto, supra, that one may belong to a group having illegal aspects and not be found to be a conspirator. But in my view the court's acquittal of Spock demonstrates the inapplicability of Scales to this case-- for a realistic approach to Scales would result in the conviction of Spock and many others who signed the 'Call'-- that is, if the unambiguous statements and subsequent legal acts tests have any meaning. The court's action underscores my conviction that in the First Amendment area finely honed distinctions do not serve as effective safeguards because they do not provide a basis for prediction of the legal consequences of future conduct.
 
 
 93
 The court's acquittal of Ferber does not, as in the case of Spock, stem from application of the tests for specific intent. The court does not reach that point, having determined-- on conventional conspiracy analysis-- that there was insufficient evidence of Ferber's having at any time joined the conspiracy. In my view this conclusion is not warranted by precedent or theory.
 
 
 94
 It is true, of course, that Ferber did not sign the 'Call', but it is well settled that one may join a conspiracy subsequent to its original formation by adopting its goals and adhering to its purposes. Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947). By Ferber's own admission, the planners of the Arlington Street Church ceremony knew of the October 2 press conference, the contents of the 'Call', and the future plans for a Washington demonstration on October 20. Indeed, with respect to the latter, Ferber stated that he viewed the Washington affair as an opportunity to be taken advantage of. Most importantly, it was Ferber who furnished the link between Arlington and Washington by obtaining the defendant Coffin's participation in the Arlington ceremony, and by subsequently delivering the cards turned in at Arlington in Washington on October 20. In light of these facts, it is, in my opinion, straining to say that the jury could not have found Ferber to be a co-conspirator.[14] Indeed, this is particularly true in light of the court's approving citation of Interstate Circuit, Inc. v. United States, supra, where the Supreme Court, in discussing agreement, said: 'It was enough that, knowing that concerted action was contemplated and invited, (the defendants) gave their adherance to the scheme and participated in it.' 306 U.S. at 226, 59 S.Ct. at 474.
 
 
 95
 In my view the court's acquittal of Spock and Ferber is the product of its own generosity rather than the inevitable result of its rationale. Were this only a disagreement over the application of legal principles, perhaps there would not be so much cause for concern. But this is a landmark case and no one, I take it, supposes that this will be the last attempt by the government to use the conspiracy weapon. The government has cast a wide net and caught only two fish. My objection is not that more were not caught but that the government can try again on another day in another court and the court's rationale provides no meaningful basis for predicting who will find themselves within the net. Finally, there is the greater danger that the casting of the net has scared away many whom the government had no right to catch.
 
 APPENDIX
 A Call to Resist Illegitimate Authority
 
 96
 To the young men of America, to the whole of the American people, and to all men of good will everywhere:
 
 
 97
 1. An ever growing number of young American men are finding that the American war in Vietnam so outrages their deepest moral and religious sense that they cannot contribute to it in any way. We share their moral outrage. 2. We further believe that the war is unconstitutional and illegal. Congress has not declared a war as required by the Constitution. Moreover, under the Constitution, treaties signed by the President and ratified by the Senate have the same force as the Constitution itself. The Charter of the United Nations is such a treaty. The Charter specifically obligates the United States to refrain from force or the threat of force in international relations. It requires member states to exhaust every peaceful means of settling disputes and to submit disputes which cannot be settled peacefully to the Security Council. The United States has systematically violated all of these Charter provisions for thirteen years. 3. Moreover, this war violates international agreements, treaties and principles of law which the United States Government has solemnly endorsed. The combat role of the United States troops in Vietnam violates the Geneva Accords of 1954 which our government pledged to support but has since subverted. The destruction of rice, crops and livestock; the burning and bulldozing of entire villages consisting exclusively of civilian structures; the interning of civilian non-combatants in concentration camps; the summary executions of civilians in captured villages who could not produce satisfactory evidence of their loyalties or did not wish to be removed to concentration camps; the slaughter of peasants who dared to stand up in their fields and shake their fists at American helicopters;-- these are all actions of the kind which the United States and the other victorious powers of World War II declared to be crimes against humanity for which individuals were to be held personally responsible even when acting under the orders of their governments and for which Germans were sentenced at Nuremberg to long prison terms and death. The prohibition of such acts as war crimes was incorporated in treaty law by the Geneva Conventions of 1949, ratified by the United States. These are commitments to other countries and to Mankind, and they would claim our allegiance even if Congress should declare war. 4. We also believe it is an unconstitutional denial of religious liberty and equal protection of the laws to withhold draft exemption from men whose religious or profound philosophical beliefs are opposed to what in the Western religious tradition have been long known as unjust wars. 5. Therefore, we believe on all these grounds that every free man has a legal right and a moral duty to exert every effort to end this war, to avoid collusion with it, and to encourage others to do the same. Young men in the armed forces or threatened with the draft face the most excruciating choices. For them various forms of resistance risk separation from their families and their country, destruction of their careers, loss of their freedom and loss of their lives. Each must choose the course of resistance dictated by his conscience and circumstances. Among those already in the armed forces some are refusing to obey specific illegal and immoral orders, some are attempting to educate their fellow servicemen on the murderous and barbarous natureof the war, some are absenting themselves without official leave. Among those not in the armed forces some are applying for status as conscientious objectors to American aggression in Vietnam, some are refusing to be inducted. Among both groups some are resisting openly and paying a heavy penalty, some are organizing more resistance within the United States and some have sought sanctuary in other countries. 6. We believe that each of these forms of resistance against illegitimate authority is courageous and justified. Many of us believe that open resistance to the war and the draft is the course of action most likely to strengthen the moral resolve with which all of us can oppose the war and most likely to bring an end to the war. 7. We will continue to lend our support to those who undertake resistance to this war. We will raise funds to organize draft resistance unions, to supply legal defense and bail, to support families and otherwise aid resistance to the war in whatever ways may seem appropriate. 8. We firmly believe that our statement is the sort of speech that under the First Amendment must be free, and that the actions we will undertake are as legal as is the war resistance of the young men themselves. But we recognize that the courts may find otherwise, and that if so we might all be liable to prosecution and severe punishment. In any case, we feel that we cannot shrink from fulfilling our responsibilities to the youth whom many of us teach, to the country whose freedom we cherish, and to the ancient traditions of religion and philosophy which we strive to preserve in this generation. 9. We call upon all men of good will to join us in this confrontation with immoral authority. Especially we call upon the universities to fulfill their mission of enlightenment and religious organizations to honor their heritage of brotherhood. Now is the time to resist.
 
 For further information contact
 
 98
 RESIST, 166-5th Ave., NYC 10010/675-2270 10010/675-2270
 
 
 99
 *Printed by volunteer labor
 
 Resist
 Room 210, 166 Fifth Avenue, New York
 August 1967
 Dear Friend:
 
 100
 The time has come to resist the war in Vietnam.
 
 
 101
 The enclosed statement, 'A Call to Resist Illegitimate Authority,' constitutes a first step toward the more vigorous response to the war which the time requires of us. Those who have signed, including ourselves, have pledged themselves to extend material and moral support to young men who are directly resisting the war. Many of us are further committed to joining those young men in acts of civil disobedience.
 
 
 102
 Over 200 persons have already signed the statement. The statement and the names of the signers will be made public at the end of September through a press conference held by a committee of prominent signers and through ads in The New York Review of Books and The New Republic.
 
 
 103
 We ask you to join us by signing 'A Call to Resist Illegitimate Authority.' More than that, we ask you to commit yourself to the fullest possible extent to the tasks of resisting the war and bringing it to a halt.
 
 
 104
 There is an urgent need for funds to bring assistance to draft resisters and to those in the armed forces who refuse to fight in Vietnam. Will you help as generously as you can?There is an equally urgent need to organize local groups of academics, clergymen, professionals and other adults for the purpose of directly supporting those who resist the draft and the armed forces. Are you willing to organize or join such a group in your community?
 
 
 105
 We can all do something to end this war. And we must.
 
 
 106
 (S) NOAM CHOMSKY NOAM CHOMSKY (S) WILLIAM S. COFFIN, JR. WILLIAM S. COFFIN, JR. Sincerely, (S) DWIGHT MACDONALD DWIGHT MACDONALD (S) BENJAMIN SPOCK BENJAMIN SPOCK
 
 
 107
 clip and send to: RESIST/Rm. 510/166 5th Ave. /NYC 10010
 
 
 108
 ......I wish to sign 'A Call to Resist Illegitimate Authority' and am willing to have my endorsement made public.
 
 
 109
 ......I enclose a contribution of $.......... to support the work of RESIST. (Please make checks payable to RESIST.)
 
 
 110
 ......I am interested in organizing or joining a group in my community to support young men directly resisting the war.
 
 
 111
 name ............................................................
 
 
 112
 profession and title ............................................
 
 
 113
 address .........................................................
 
 
 114
 city ............................ state ...........................
 
 
 115
 phone ...................... (office) ....................... (home)
 
 
 
 [1]
 A fifth defendant was acquitted, and will not be further referred to
 
 
 [2]
 In addition, considerable evidence was introduced of Spock's participation in a sit-in in front of the Whitehall induction center in New York City. We will assume with the defendants and now, apparently, the government as well, that this was token activity and protected political expression. See Brown v. Louisiana, 1966, 383 U.S. 131, 141-142, 86 S.Ct. 719, 15 L.Ed.2d 637; but cf. Adderley v. Florida, 1966, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149; Cox v. Louisiana, 1965, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487. Because of our resolution of the case on other grounds we need not pursue this matter, or explore the possibility of prejudice arising from the introduction of this evidence
 
 
 [3]
 Hereinafter, without distinction, draft cards
 
 
 [4]
 We do not understand the government to interpret 50 App. U.S.C. 462(a) to cover hindering or interfering with the nonrecruitment activities of the armed services. Such action would be criminal under the Espionage Act, 18 U.S.C. 2387, 2388(a), 2391
 
 
 [5]
 The brief of the Unitarian Universalist Association, amicus, is the only one which envisages that, although the defendants may have committed illegal acts, their conviction might impermissibly affect First Amendment rights of third parties. In considering this matter we are not troubled by questions of standing. Compare Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, with United States v. Raines, 1960, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524
 
 
 [6]
 Because of the identity of surname with one of the defendants, we will hereafter refer to Judge Coffin simply as the dissent
 
 
 [7]
 In Direct Sales Co. v. United States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674, for example, the agreement was embodied in catalogues widely distributed through the mails, and in order blanks the form of which was prescribed by the Secretary of the Treasury and which were, by law, retained for government inspection. Indeed, periodic reports, some monthly, some weekly, were made by Direct Sales to the government disclosing the names of purchasers and the amounts of purchases. The dissent supports its attachment to overtness with a dictum by Mr. Justice Harlan in Grunewald v. United States, 1957, 353 U.S. 391, 402, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 ('every conspiracy is by its very nature secret'). With great respect to the Justice, this was a somewhat casual remark in a case dealing with a plainly illegal conspiracy, and is erroneous, as even the dissent's citations demonstrate. We may be pardoned for observing that more affection seems to be exhibited for this dictum than for some of the Justice's holdings in connection with agreements that are partly legal and partly not
 
 
 [8]
 Other cases in which the conspiracy itself was to a large degree public include Wells v. United States, 9 Cir., 1919, 257 F. 605 (meetings, apparently public, and circulars widely distributed demanding 'Resist. Refuse.'); Haywood v. United States, 7 Cir., 1920, 268 F. 795, cert. denied 256 U.S. 689, 41 S.Ct. 449, 65 L.Ed. 1172; Anderson v. United States, 8 Cir., 1921, 273 F. 20, cert. denied 257 U.S. 647, 42 S.Ct. 56, 66 L.Ed. 415; United States v. Gordon, 7 Cir., 1943, 138 F.2d 174, cert. denied 320 U.S. 798, 64 S.Ct. 266, 88 L.Ed. 481. See also Pierce v. United States, 1920, 252 U.S. 239, 40 S.Ct. 205, 64 L.Ed. 542; Schenck v. United States, 1919, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470
 
 
 [9]
 Neither can the claim that the conspiracy was 'non-cohesive.' If any cohesive motive be thought necessary where there already was a written document, cf. Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 222, 59 S.Ct. 467, 83 L.Ed. 610, there was ample common purpose here. The dissent's emphasis upon 'discipline' again confuses means and result. Discipline may be needed for a secret conspiracy in order to keep it secret. The thrust of conspiracy, however, is in the agreement for joint action, not in the method of accomplishing it
 
 
 [10]
 The 'general principle (is) that society, having the power to punish dangerous behavior, cannot be powerless against those who work to bring about that behavior.' Scales v. United States, 1961, 367 U.S. 203, 225, 81 S.Ct. 1469, 1484, 6 L.Ed.2d 782
 
 
 [11]
 'Throughout our decisions there has recurred a distinction between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken.' Justice Frankfurter concurring in Dennis v. United States, 1951, 341 U.S. 494, 545, 71 S.Ct. 857, 885, 95 L.Ed. 1137, quoted in Yates v. United States, 1957, 354 U.S. 298, 322, 77 S.Ct. 1064, 1 L.Ed.2d 1356, and again in Noto v. United States, 1961, 367 U.S. 290, 297, 81 S.Ct. 1517, 6 L.Ed.2d 836. Cf. Gitlow v. New York, 1925, 268 U.S. 652, 673, 45 S.Ct. 625, 69 L.Ed. 1138 (Holmes, J., dissenting) ('Every idea is an incitement.')
 
 
 [12]
 The occasionally asserted judicial hostility to conspiracy prosecutions, Krulewitch v. United States, 1949, 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790 (Jackson, J., concurring); United States v. Falcone, 2 Cir., 1940, 109 F.2d 579, 581, aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, springs largely from the government's overenthusiastic use of some of the procedures of conspiracy law rather than from a rejection of the public interest served by that law. Indeed, Justice Jackson, author of the Krule-witch concurrence, noted in Dennis v. United States, 341 U.S. at 577, 71 S.Ct. at 901: 'There is no constitutional right to 'gang up' on the Government.'
 
 
 [13]
 The issue may perhaps be more objectively considered if we approach it in terms other than the present case where it may be easy to sympathize with many of the defendants' aims and be tempted to overlook, as incidental and peripheral, the illegal aspects of some of the means. It is not difficult to visualize conspirators whose basic ends are plainly illegal but who color them in order to obtain needed support of others, innocent and well intentioned, by adding lawful and popular objects
 
 
 [14]
 'I have never suggested or counseled or advocated that any one other person burn their draft card. In fact, I have mine in my pocket and will produce it if you wish. I do not advocate that people should break laws. What I simply try to say was that I admired the courage of someone who could act on his convictions knowing that he faces pretty stiff consequences.' 385 U.S. at 134, 87 S.Ct. at 348
 
 
 [15]
 See generally, Richardson, Freedom of Expression and the Function of Courts, 65 Harv.L.Rev. 1 (1951)
 
 
 [16]
 We note Spock's candid statement that direct urging of draft violations would in his opinion be 'poor psychological practice.'
 
 
 [17]
 Justice Harlan noted in Scales, 367 U.S. at 229, 81 S.Ct. at 1486, '(A) technical conspiracy * * * is defined by its criminal purpose, so that all knowing association with the conspiracy is a proper subject for criminal proscription as far as First Amendment liberties are concerned.' See United States v. Borelli, 2 Cir., 1964, 336 F.2d 376, 384-385, cert. denied Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555; United States v. Falcone, 2 Cir., 1940, 109 F.2d 579, 581, aff'd 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128; United States v. Peoni, 2 Cir., 1938, 100 F.2d 401; Developments in the Law-- Criminal Conspiracy, 72 Harv.L.Rev. 920, 925-27 (1959)
 
 
 [18]
 The Court said in Scales, 367 U.S. at 229-230, 81 S.Ct. at 1486, 'Thus the member for whom the organization is a vehicle for the advancement of legitimate aims and policies does not fall within the ban of the statute: he lacks the requisite specific intent 'to bring about the overthrow of the government as speedily as circumstances would permit.' Such a person may be foolish, deluded, or perhaps merely optimistic, but he is not by this statute made a criminal.' See also Elfbrandt v. Russell, 384 U.S. at 15-17, 86 S.Ct. 1238
 
 
 [19]
 Accord, Hellman v. United States, 9 Cir., 1961, 298 F.2d 810. See also Nowak v. United States, 1958, 356 U.S. 660, 665-668, 78 S.Ct. 955, 2 L.Ed.2d 1048; Hartzel v. United States, 1944, 322 U.S. 680, 686-687, 64 S.Ct. 1233, 88 L.Ed. 1534; United States v. Tramaglino, 2 Cir., 1952, 197 F.2d 928, 930-931, cert. denied 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670; cf. United States v. Bruno, 2 Cir., 1939, 105 F.2d 921, rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257
 
 
 [20]
 We do not believe that section 462(a) is overbroad or vague. See Gara v. United States, 6 Cir., 1949, 178 F.2d 38, aff'd by an equally divided court, 340 U.S. 857, 71 S.Ct. 87, 95 L.Ed. 628; Warren v. United States, 10 Cir., 1949, 177 F.2d 596, cert. denied 338 U.S. 947, 70 S.Ct. 485, 94 L.Ed. 584; Kiyoshi Okamoto v. United States, 10 Cir., 1945, 152 F.2d 905, 906-907; cf. Singer v. United States, 1945, 323 U.S. 338, 65 S.Ct. 282, 89 L.Ed. 285. A special obligation exists as to federal statutes to construe them so to avoid unconstitutionality, Scales v. United States, supra, so long as such does not result in substantial re-writing. See Aptheker v. Secretary of State, 1964, 378 U.S. 500, 515-516, 84 S.Ct. 1659, 12 L.Ed.2d 992. The fact that a seemingly normal criminal statute, by virtue of its prohibition of conspiracy and crime counselling, may in some instances apply to affect freedom of association or freedom of speech does not invalidate the statute. See United States v. O'Brien, 1968, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. The court's obligation is, rather, to make sure that such a statute does not improperly infringe upon speech in any particular instance. See, e.g., Street v. New York, U.S., April 21, 1969, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572. Nor do we believe the indictment failed in its function of informing the defendants of the crime with which they were charged. See Wong Tai v. United States, 1927, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545
 
 
 [21]
 Because we are discussing only the evidence of an agreement, the government's vacillation about which part of the evidence it relied on cannot, without some special showing, be taken to have prejudiced the defendants. On the contrary, the government is entitled to rely on whatever agreement is shown by the evidence. Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680. The defendants do not destroy the government's case by themselves showing a somewhat different but equally illegal agreement
 
 
 [22]
 The Call and the cover letter are reproduced in full in an appendix hereto
 
 
 [23]
 See also n. 9, supra. By the same token, nothing is taught by the frequently stressed fact that the signatories were in many instances persons of prominence, or that, apart from their common opposition to the war and to the draft, they were of disparate backgrounds and interests. See United States v. Lester, 3 Cir., 1960, 282 F.2d 750, 752-753, cert. denied 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368; Carbo v. United States, 9 Cir., 1963, 314 F.2d 718, 734, cert. denied Palmero v. United States, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498
 
 
 [24]
 In Frania the court said, 255 F. at 34, 'This case is one of the simplest instances of proper proof in limine of combination ever brought to a court's attention. If, as per advertisement, an audience is gathered before a platform containing intending speakers, and is called to order by a chairman, who announces the object of the gathering, again, as per advertisement, it is impossible not to infer a combination in thought among the platform occupiers and their helpers.' The rule of strictissimi juris may well require greater proof today of a defendant's specific intent, but in distinguishing Fraina on this ground the dissent confuses consensual principles with the ascertainment of what was consented to. The principles remain. See Yates v. United States, supra, 354 U.S. at 333, 77 S.Ct. 1064
 
 
 [25]
 Bozza v. United States, 1947, 330 U.S. 160, 165, 67 S.Ct. 645, 91 L.Ed. 818; Glasser v. United States, supra n. 21; White v. United States, 9 Cir., 1968, 394 F.2d 49, 53
 
 
 [26]
 The Call, which was printed as a paid advertisement in two national publications, and circulated separately, underwent a few changes. In all instances in describing 'forms of resistance' it stated, 'among those already in the armed forces some are refusing to obey specific illegal and immoral orders.' In some editions it added, 'some are absenting themselves without official leave.' Neither of these methods connotes legal resistance
 
 
 [27]
 Additionally, we note that defendant Goodman's printed statement at the October 2 press conference contained the following: 'The activity of the Resistance groups will be continuing beyond October 16, as more draft refusers come forward. It is our intention to parallel that development with continuing private and public activity in support of them.'
 
 
 [28]
 Were it necessary to go any further, the Washington demonstration, planned by Goodman and Coffin, completed the surrender of draft cards; those who 'surrendered' them at the Arlington Street Church having been told that they had a right of recall. This act, of course, was not mere speech, and could be found to satisfy the requirement of a 'course of conduct clearly undertaken for the specific purpose of rendering effective' the illegal objects of the agreement. Scales v. United States, 367 U.S. at 234, 81 S.Ct. 1469
 
 
 [29]
 In spite of this final remark, made then and at other times, by both Coffin and Goodman, they argue now that they were not guilty if they believed that their actions were legal and that any conviction would be unconstitutional. For this they cite Keegan v. United States, 1945, 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745. The opinions there, however, are far from clear as to the extent of such a principle; nor have other courts reached a consensus. Compare Holdridge v. United States, 8 Cir., 1960, 282 F.2d 302, 310-311, and Kiyoshi Okamoto v. United States, 10 Cir., 1945, 152 F.2d 905, with Lantis v. United States, 9 Cir., 1950, 186 F.2d 91, 92-93, and Warren v. United States, 10 Cir., 1949, 177 F.2d 596, 600, cert. denied 338 U.S. 947, 70 S.Ct. 485, 94 L.Ed. 584. A defendant's motive in testing an act might properly go to sentence, but these defendants are contending that, having violated the statute, they should, in effect, be subject only to a riskless declaratory judgment. No such purpose was made known until the defendants reached the courtroom. Before that time, they publicly asserted that they were placing their own necks on the block. They should not now be heard to say that no axe was involved
 
 
 [30]
 Willful nonpossession of a draft card is criminal. O'Brien v. United States, 1 Cir., 1967, 376 F.2d 538, rev'd on other grounds, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. One 'who contributed consciously to furthering that illicit enterprise aided and abetted its commission.' United States v. Johnson, 1943, 319 U.S. 503, 515, 63 S.Ct. 1233, 1239, 87 L.Ed. 1546. Accord, United States v. Williams, 1951, 341 U.S. 58, 64, 71 S.Ct. 595, 95 L.Ed. 747; Nye & Nissen v. United States, 1949, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919; see also United States v. Peoni, 2 Cir., 1938, 100 F.2d 401. Coffin was not merely present in the church, Hicks v. United States, 1893, 150 U.S. 442, 449-450, 14 S.Ct. 144, 37 L.Ed. 1137; Long v. United States, 1966, 124 U.S.App.D.C. 14, 360 F.2d 829, 835, he was an active, knowing participant. Wyatt v. United States, 10 Cir., 1968, 388 F.2d 395; Moore v. United States, 5 Cir., 1966, 356 F.2d 39; cf. United States v. Manna, 2 Cir., 1965, 353 F.2d 191, cert. denied, 384 U.S. 975, 86 S.Ct. 1868, 16 L.Ed.2d 685
 
 
 [31]
 See n. 16, supra
 
 
 [32]
 This, too, dissatisfies the dissent, which is unhappy whatever we do. Viz., because we recognize the necessity of special protection, thereby letting some defendants go free, we should not punish conspiracies in the field of speech at all; it is improper to apply the Scales and Noto safeguard because it is not strict enough; here we have applied it too strictly. Continuing with Ferber, infra, this conspiracy is too broad, it might have been proper to prosecute Ferber for a conspiracy limited to the Arlington Street Church matter; it is over-generous not to regard Arlington Street as a joining of the larger conspiracy. Basically, all this means is that the dissent refuses to draw distinctions
 
 
 [33]
 A similar situation involving a demonstrably active, as opposed to passive, participant in a bifarious organization, was faced in Hellman v. United States, supra note 19. While 'Hellman was an exceedingly active member of the Party,' 298 F.2d at 813, the court found that there was insufficient proof, given a strictissimi juris standard, to show specific intent to further the Party's illegal, as opposed to legal, methods. 'The activity portrayed is explainable on the basis that he intended to bring about the Party's ultimate goals through peaceable means.'
 
 
 [34]
 The government has not raised the point, nor do we see independently any reason to suppose that a new trial would result in a stronger case for the government. Cf. Yates v. United States, supra, at 328, 77 S.Ct. 1064; United States v. Johnson, supra
 
 
 [35]
 McNabb v. United States, 1943, 318 U.S. 332, 340-341, 63 S.Ct. 608, 87 L.Ed. 819; Thomas v. United States, 5 Cir., 1966, 368 F.2d 941, 947; Delaney v. United States, 1 Cir., 1952, 199 F.2d 107; see also Note: The Supervisory Power of the Federal Courts, 76 Harv.L.Rev. 1656 (1963)
 
 
 [36]
 Although no prejudice is apparent we can see no reason for individual treatment of 'notices of classification' and 'registration certificates.' It is true that these documents are listed separately in the statute and in the indictment, but the record discloses no basis for distinction
 
 
 [37]
 'If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute.'
 
 
 [38]
 United Brotherhood of Carpenters and Joiners of America v. United States, 1947, 330 U.S. 395, 408, 67 S.Ct. 775, 91 L.Ed. 973; Sparf v. United States, 1895, 156 U.S. 51, 105-106, 15 S.Ct. 273, 39 L.Ed. 343; Compton v. United States, 8 Cir., 1967, 377 F.2d 408, 411; Edwards v. United States, 5 Cir., 1960, 286 F.2d 681, 683; United States v. Taylor, C.C.D.Kan., 1882, 11 F. 470, 474
 
 
 [39]
 Indeed, under our law a jury's verdict, representing the common sense and wisdom of the community, is so highly regarded that the government itself may insist on trial by jury rather than trial by judge. Singer v. United States, 1965, 380 U.S. 24, 36, 85 S.Ct. 783, 13 L.Ed.2d 630
 
 
 [40]
 'Such devices are used to impair or wholly take away the power of a jury to render a general verdict. One of the ancient, fundamental reasons for having general jury verdicts was to preserve the right of trial by jury as an indispensable part of a free government. Many of the most famous constitutional controversies in England revolved around litigants' insistence, particularly in seditious libel cases, that a jury had the right to render a general verdict without being compelled to return a number of subsidiary findings to support its general verdict. Some English jurors had to go to jail because they insisted upon their right to render general verdicts over the repeated commands of tyrannical judges not to do so. Rule 49 is but another means utilized by courts to weaken the constitutional power of juries and to vest judges with more power to decide cases according to their own judgments.'
 Statement of Mr. Justice Black and Mr. Justice Douglas on the Rules of Civil Procedure and the Proposed Amendments, 31 F.R.D. 617, 618-619 (1963).
 
 
 [41]
 There are only two classes of cases in which such findings have been used. First, in certain cases the determination of a particular fact will be crucial to sentencing the defendants, as, for example, which of the several objects of a conspiracy, some felonies, some misdemeanors, the defendant agreed to, or the duration of a defendant's participation in a conspiracy. United States v. Sobell, 2 Cir., 1963, 314 F.2d 314, 329 n. 12, cert. denied, 374 U.S. 857, 83 S.Ct. 1906, 10 L.Ed.2d 1077; Continental Baking Co. v. United States, 6 Cir., 1960, 281 F.2d 137, 155; Williams v. United States, 5 Cir., 1956, 238 F.2d 215, 218-220, cert. denied, 352 U.S. 1024, 77 S.Ct. 589, 1 L.Ed.2d 596; United States v. Haim, S.D.N.Y., 1963, 218 F.Supp. 922; United States v. Simon, S.D.N.Y., 1960, 186 F.Supp. 223; United States v. Ogull, S.D.N.Y., 1957, 149 F.Supp. 272, affirmed, without discussion of this point, sub nom., United States v. Gernie, 2 Cir., 1958, 252 F.2d 664, cert. denied, 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073. Second, in treason cases the finding of an overt act is specifically required by the federal constitution. U.S. Const. art. III, 3; Kawakita v. United States, 1952, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249, aff'g 190 F.2d 506, 9 Cir., 1951, aff'g 96 F.Supp. 824, S.D.Cal., 1950; United States v. Best, D.Mass., 1948, 76 F.Supp. 138, 857, conviction aff'd 184 F.2d 131, 1 Cir., 1950, cert. denied, 340 U.S. 939, 71 S.Ct. 480, 95 L.Ed. 677; United States v. Chandler, D.Mass., 1947, 72 F.Supp. 230, conviction aff'd 171 F.2d 921, 1 Cir., 1948, cert. denied, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081. See also Haupt v. United States, 1947, 330 U.S. 631, 641 n. 1, 67 S.Ct. 874, 91 L.Ed. 1145; Cramer v. United States, 1945, 325 U.S. 1, 36 n. 45, 65 S.Ct. 918, 89 L.Ed. 1441
 41A Since the release of this opinion our attention has been called to the case of Commonwealth v. Bartholomew, 1950, 326 Mass. 218. There the court, without deciding whether it was error to submit 'specific questions of fact' to be answered by a jury in a criminal case, held that the court's submission in that particular instance over the defendants' objection had not been prejudicial. In passing we will say that this was a finding more easily reached there than here, and that in the case at bar we could not make it. But, more fundamentally, we do not think it desirable to treat this issue by weighing subjective prejudice; to some extent the pressure is always present. In all of the cases cited in Bartholomew as involving special verdicts, the most that occurred was that the jury, sua sponte, announced a finding of fact. While citing the leading case of Commonwealth v. Anthes, 1855, 5 Gray (71 Mass.) 185, for the proposition that although a jury 'may return a special verdict, they are not bound to do so,' the court did not note that the question had arisen only in that limited context. Sua sponte special findings, in our opinion, are very different from findings requested by the court.
 
 
 [42]
 If the procedure was, as we hold, prejudicial to the rights of the defendants, it is not saved by the propriety of the court's motive, doubtless a strong one in this particular case where difficult legal issues were involved, cf. Yates v. United States, supra, of avoiding an appellate court's dilemma due to ignorance of what theory the jury based its verdict upon. Stromberg v. California, 1931, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117. Assuming this to be proper, as to which we express no final opinion, it could have been accomplished by sending the jury out to answer special questions after it had returned its general verdict
 
 
 [1]
 The court, in its footnote 9, criticizes my reference to discipline as a traditional component of conspiracy, citing Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). In that case cohesiveness was effectively assured by the presence of substantial economic factors which impelled near unanimity of action. To derive sanction from what was in effect a monopoly power play for the proposition that cohesiveness and discipline are unimportant in conspiracy law, particularly in the public expression area, seems to me an unjustified leap in the wrong direction
 
 
 [2]
 Nevertheless I confess to sharing the bias expressed by Mr. Justice Harlan, dissenting in Grunewald v. United States, 353 U.S. 391, 402, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957), that: * * * Every conspiracy is by its very nature secret; a case can hardly be supposed where men concert together for crime and advertise their purpose to the world.'
 This statement was the manifestation of Justice Harlan's concern with the limitless capacity of conspiracy theory to expand itself. Specifically, the remark was in response to an argument that conspiracy could be inferred from the mere existence of concealment of activities.
 In my view the statement also reflects an intuitive grasp of the limits of conspiracy. Just as there is reason to fear the expansion of conspiracy based on the mere existence of secrecy, there is equal justification-- indeed, more-- in fearing expansion of conspiracy into the realm of public discussion.
 
 
 [3]
 See, e.g., Dennis v. United States, 341 U.S. 494, 71 S.Ct. 587, 95 L.Ed. 1137 (1951); Pierce v. United States, 252 U.S. 239, 40 S.Ct. 205, 64 L.Ed. 542 (1920); Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919)
 The 'public' conspiracy cases cited by the court would appear to fall within this category in that in each case the efforts of a cohesive group were aimed at a single illegal goal-- the frustration of conscription. See, e.g., Wells v. United States, 257 F. 605 (9th Cir., 1919) (No Conscription League); Haywood v. United States, 268 F. 795 (7th Cir.), cert. denied, 256 U.S. 689, 41 S.Ct. 449, 65 L.Ed. 1172 (1920) (Industrial Workers of the World); Anderson v. United States, 273 F. 20 (8th Cir.), cert. denied, 257 U.S. 647, 42 S.Ct. 56, 66 L.Ed. 415 (1921) (Industrial Workers of the World); United States v. Gordon, 138 F.2d 174 (7th Cir.), cert. denied, 320 U.S. 798, 64 S.Ct. 266, 88 L.Ed. 481 (1943) (Peace Movement of Ethiopia).
 Even within the limits of a cohesive group and a single illegal purpose I question whether the above cases would be sound authority today-- not because age carries a presumption of invalidity, but because in none of the cases did the court demonstrate an appreciation of First Amendment issues. Indeed, in Gordon, supra, and Wells, supra, the First Amendment was discussed only in passing, and in Haywood, supra, and Anderson, supra, not at all. See also Fraina v. United States, 255 F. 28 (2d Cir. 1918), discussed infra.
 
 
 [4]
 See, e.g., Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); Noto v. United States, 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961)
 
 
 [5]
 While a half century's age is not necessarily fatal, Fraina would not appear to have outlived its time. Two men addressed a meeting each detailing why he was a conscientious objector. A pamphlet describing the philosophy and proper response of the conscientious objector was distributed. The court, blessedly oblivious of contemporary meetings where a goodly part of the audience come to heckle, was able to say that if a meeting is called to hear certain speakers on a certain subject, 'It is impossible not to infer a combination in thought among the platform occupiers and their helpers.' 255 F. at 34. The court drew sustenance from the principle that the standards by which to judge whether speech should be proscribed are 'the common-law rules in force when the constitutional guaranties were established.' In my view the court's comments on both conspiracy law and the First Amendment demonstrate that the opinion is only of antiquarian interest
 
 
 [6]
 This analysis is, I believe, consistent with the historic reluctance, recognized by the court, to expand conspiracy law. See, e.g., Von Moltke v. Gillies, 332 U.S. 708, 728, 68 S.Ct. 316, 92 L.Ed. 309 (1948) (concurring opinion by Justice Frankfurter); United States v. Falcone, 109 F.2d 579 (2d Cir. 1940); see generally O'Brien, Loyalty Tests and Guilt by Association, 61 Harv.L.Rev. 592 (1948)-- and with the evolving insistence on First Amendment rights in many areas of national life. See, e.g., Street v. New York, 394 U.S. 572, 89 S.Ct. 1354, 22 L.Ed.2d 572 (April 21, 1969); Stanley v. Georgia, 393 U.S. 819, 89 S.Ct. 124, 21 L.Ed.2d 90 (1969); Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (February 24, 1969); Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)
 
 
 [7]
 Disconcertingly, however, the court acquits the defendant Ferber primarily because he did not sign the 'Call'
 
 
 [8]
 I assume that if X were to say unambiguously, before or after signing the 'Call', 'What I would really like to see is every local draft board deluged with turn-ins,' he becomes a conspirator on the happening of the later event although each statement is, by itself, protected. Moreover, the period of time between the two statements is apparently subject to no statute of limitations
 
 
 [9]
 Counsel for defendants were faced alternatively, and at different times, with theories that the Call was the agreement and ipso facto proof of the conspiracy, that specific events were themselves the basis for smaller conspiracies, and finally that evidence of specific intent as demonstrated by their subsequent speech and legal acts was to be the ultimate ground for determination of their guilt
 
 
 [10]
 Indeed, this principle is particularly applicable here, where, as the court concedes, the jury may not have been adequately instructed as to specific intent, and may have been erroneously permitted to determine a defendant's culpability by reference to the remarks and acts of other alleged co-conspirators some of whom were not defendants
 
 
 [11]
 For the analogous situation where the application of otherwise valid regulations was held invalid as applied, see Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Wolff v. Selective Service Local Board No. 16, 372 F.2d 817 (2d Cir. 1967); National Student Ass'n v. Hershey, 412 F.2d 1103 (D.C.Cir., June 6, 1969)
 
 
 [12]
 Spock was well aware of his ability to generate publicity, and he admitted that this was the reason for his attendance at so many press conferences and public forums
 
 
 [13]
 Spock denied describing his participation in these terms but the jury was not obliged to believe him
 
 
 [14]
 The court's acquittal of Spock and Ferber poses a hard question in terms of the realities of such a trial as that below. While trial judges must often carry nice legal distinctions in their minds while absorbing great quantities of evidence, it is difficult for me to imagine that, at the close of the government's case, the district judge would have granted or could have been expected to grant two motions for acquittal and deny others